578 So.2d 1192 (1991)
Paul HIDDING and Rubinell Hidding
v.
Dr. Randall A. WILLIAMS, et al.
No. 90-CA-765.
Court of Appeal of Louisiana, Fifth Circuit.
April 17, 1991.
*1193 Gregory F. Gambel, Byron J. Casey, III, New Orleans, for plaintiffs/appellees.
Robert Garrity, Harahan, for plaintiffs/appellees.
Lloyd W. Hayes, Katherine B. Muslow, Thomas, Hayes and Beahm, New Orleans, for defendants/appellants.
Before GRISBAUM, WICKER and GOTHARD, JJ.
GOTHARD, Judge.
The issue before us in this medical malpractice case is whether the district judge was correct in finding that the defendant doctor failed to obtain his patient's informed consent to surgery. We affirm.
*1194 On December 17, 1984, fifty-nine year old Paul Hidding underwent a decompressive central laminectomy, L-3 to the sacrum, at the hands of orthopaedic surgeon Randall A. Williams, M.D. Mr. Hidding immediately suffered a loss of bowel and bladder control. His excretory systems were rendered non-functional and he remained incontinent until his death from an unrelated cause in January, 1990.
Paul Hidding and his wife Rubinell filed suit against Dr. Williams and his insurer, The Hartford Fire Insurance Company, contending that the doctor was negligent in performing the lumbar surgery and in failing to adequately advise Mr. Hidding of the risks associated with the surgery. After a two day bench trial the district judge found in favor of plaintiff and against the defendant doctor; he awarded Mrs. Hidding $307,006.50 in medical and general damages.
Dr. Williams and his insurer have appealed. The post-judgment intervenors, Douglas A. Green, the Commissioner of Insurance for the State of Louisiana, the Office of the Attorney General and the Louisiana Patient's Compensation Fund lodged a separate motion for appeal but have joined in the doctor's brief.
Appellants urge that the district judge committed reversible error in finding that Dr. Williams did not obtain Mr. Hidding's informed consent to undergo the lumbar laminectomy. They contend that the fact-finder was clearly wrong in concluding that: (1) Dr. Williams failed to disclose to the patient the fact that nerve damage is a known risk of this surgery, and (2) Dr. Williams was suffering from alcohol abuse at the time of the surgery and should have made this condition known to the patient. We disagree. See Hondroulis v. Schuhmacher, 553 So.2d 398 (La.1988), on rehearing.
The informed consent doctrine is based on the principle that every human being of adult years and sound mind has a right to determine what shall be done to his own body. LaCaze v. Collier, 434 So.2d 1039 (La.1983). A doctor is required to provide his patient with sufficient information to permit the patient himself to make an informed and intelligent decision on whether to submit to a proposed course of treatment. Where circumstances permit, the patient should be told the nature of the pertinent ailment or condition, the general nature of the proposed treatment or procedure, the risks involved in the proposed treatment or procedure, the prospects of success, the risks of failing to undergo any treatment or procedure at all, and the risks of any alternative method of treatment. LaCaze, 434 So.2d at 1045.
In a trial on the merits of a suit for inadequate disclosure of risk information by a physician, the patient must provide evidence to establish, prima facie, the essential elements of the cause of action. The plaintiff patient bears the burden of persuasion on these elements: (1) the existence of a material risk unknown to the patient; (2) a failure to disclose the risk on the part of the physician; (3) that disclosure of the risk would have led a reasonable patient in plaintiff's position to reject the medical procedure or choose a different course of treatment; (4) injury. Hondroulis, 553 So.2d at 404. It is clear from the record evidence that plaintiff Rubinell Hidding proved the elements of her claim at trial. The district judge was correct in finding a violation of the informed consent doctrine and granting judgment in her favor.
The inquiry of whether the procedure to be performed involves a material risk is conducted, initially, by examination of the "incidence of injury/degree of harm" ratio. Canterbury v. Spence, 464 F.2d 772, 778 (D.C.Cir.1972). On this aspect of materiality some expert testimony is necessary because only a physician or other qualified expert is capable of judging what risk exists and the likelihood of its occurrence. Once the probability of harm is defined and the parameters of the risk are established, the question of materiality becomes one for the trier of fact who must then determine whether a reasonable person in the patient's position would attach significance to the specific risk. Hondroulis, 553 So.2d at 412.
*1195 The physician is required to advise a patient of any material consequence that would influence the decision of a reasonable person in the patient's condition. Thus the second inquiry is whether Dr. Williams failed to disclose this material risk to Mr. Hidding.
LSA-R.S. 40:1299.40 requires that the nature and purpose, together with the known risks, of a medical or surgical procedure be disclosed to the patient who must then be afforded the opportunity to ask questions and must acknowledge in writing his consent to the treatment. When the form is signed the patient is presumed to have understood and agreed to encounter whatever risk a reasonable person, in what the doctor knows or should have known to be the patient's position, would have apprehended from the written form. The statutory presumption of "consent" to encounter risks adequately described in the form is rebuttable, by showing that the consent was induced by misrepresentation, that is, that it was uninformed. Hondroulis, 553 So.2d at 417.
With respect to the third and fourth elements of proof, there must be a causal relationship between the doctor's failure to disclose material information and a material risk of damage to the patient. The courts have adopted an objective standard of causation: whether a reasonable patient in plaintiff's position would have consented to the treatment or procedure had the material information and risks been disclosed. LaCaze, 434 So.2d at 1048.
Applying these legal precepts to the facts of the instant case, we find that the record supports the conclusion that Dr. Williams failed to adequately advise Mr. and Mrs. Hidding that bowel and bladder dysfunction was a risk of lumbar surgery.
Paul Hidding had undergone a prior laminectomy in 1972. Thereafter he had only intermittent back complaints, stiffness and soreness. In 1984 while on a fishing trip with his son, Mr. Hidding experienced a flare-up. According to Mrs. Hidding, he was suffering excruciating pain when he visited Dr. Williams for an examination on December 10, 1984. After conducting x-rays and a CT scan Dr. Williams diagnosed Mr. Hidding's condition as spinal stenosis: a narrowing of the spinal processes. He admitted Mr. Hidding to the hospital for surgery on December 13, 1984. Dr. Williams told Mr. Hidding that he had no choice but to undergo surgery or he would end up in a wheelchair.
At trial orthopaedic surgeon Dr. Russell Levy testified that the loss of bowel and bladder function as a result of lumbar laminectomy occurs once in 200,000 cases. While it is not the most common complication associated with back surgery it is certainly, excluding death, the most feared. Dr. Williams himself admitted the loss of excretory functioning is a known complication of spinal surgery. Dr. Levy testified that considering the generic consent form commonly in use at that time, Dr. Williams should have specifically discussed the potential for loss of bowel and bladder control with Mr. Hidding prior to surgery. The materiality of the risk is clearly established. The consequent issue is whether this risk was adequately disclosed and consented to.
The hospital records contain a surgical consent form signed on December 16, 1984 by Paul Hidding consenting to a decompressive lumbar laminectomy the purpose of which is "to attempt to relieve nerve pressure and pain". The form states that no guarantees of treatment have been made; alternative methods of treatment and the possibility of complications have been fully explained and contains the following disclaimer:
I understand and acknowledge that the following known risks are associated with this procedure including anesthesia: death; brain damage; disfiguring scars; paralysis; the loss of or loss of function of body organs; and the loss or loss of function of any arm or leg. I further acknowledge that all questions I have asked about the procedure have been answered in a satisfactory manner.
At trial Dr. Williams testified that both in office and at the hospital he explained the serious nature of the injury to Mr. *1196 Hidding and emphasized that if he did not have surgery he would lose lower body control. The progress note for December 16, 1984 states: "For decompression lam. in a.m. The procedure, alt. and possible complications discussed. No guarantee given."
On direct examination Mrs. Hidding testified that her husband had only a 6th grade education; his reading skills were minimal. At his request she accompanied him on doctors visits to insure that he understood the doctor's orders and instructions; Mr. Hidding was afraid he would miss something.
Mrs. Hidding stated that Dr. Williams advised her husband that if he did not undergo surgery he would be confined to a wheelchair for the rest of his life. The doctor did not discuss the risks of surgery or any alternative treatment during the office visit. At the hospital, after the CT scan confirmed the doctor's diagnosis of spinal stenosis, Dr. Williams again said surgery was mandated. Mr. Hidding was hestitant to undergo surgery and frightened about the pain. Dr. Williams assured Mr. Hidding that he would keep him as pain-free as possible and that he had nothing to worry about. The doctor invited Mr. and Mrs. Hidding to confer with a fellow patient on whom Dr. Williams had recently performed the same surgery.
Dr. Williams did not identify the loss of bowel and bladder function as a specific risk of surgery. He described the surgical procedure as the removal of a piece of bone and never explained that spinal nerves might be involved. Mrs. Hidding testified that had she known there was nerve involvement she would have requested a neurosurgeon assist at the surgery.
Mrs. Hidding admitted that her husband had signed the consent form. She did not remember being present when he did so but stated that she must have been. Her husband would not have understood the document and would not have signed it without first consulting her. Mrs. Hidding interpreted the phrase "loss of function of body organs" to mean "you can't get up and walk around or that when you do, you may stumble or fall or be very weak or wobbly on your feet".
To establish consent to a risk it must be shown both that the patient was aware of the risk and that he agreed to encounter it. Restatement of Torts, 2d § 892 A (1979). The physician is required to disclose material risks in such terms as a reasonable doctor would believe a reasonable patient would understand. In order for a reasonable patient to have awareness of a risk he should be told in lay language the nature and severity of the risk and the likelihood of its occurrence. A bland statement as to a risk of "loss of function of body organs" when not accompanied by any estimate of its frequency does not amount to understandable communication of any specific real risk. "An ordinary lay person would not gather from a warning that surgery involves a risk of loss of function of body organs that he or she is asked to encounter the specific material risk of being rendered permanently incontinent through loss of bladder control". Hondroulis, 553 So.2d at 421.
Trial testimony supports the conclusion that Dr. Williams did not disclose to Paul Hidding the risk that the laminectomy could result in impairment of his bowel and bladder functioning. Mrs. Hidding has successfully rebutted the presumption attached to the signed consent form. There was no "informed consent" to surgery.
Of equal if not more importance, the district judge found that Dr. Williams' failure to disclose his chronic alcohol abuse to Mr. and Mrs. Hidding vitiated their consent to surgery. Because this condition creates a material risk associated with the surgeon's ability to perform, which if disclosed would have obliged the patient to have elected another course of treatment, the fact-finder's conclusion that non-disclosure is a violation of the informed consent doctrine is entirely correct.
In October, 1986 the Louisiana State Board of Medical Examiners suspended Dr. Williams' medical license on charges of "[h]abitual or recurring drunkenness," LSA-R.S. 37:1285(4); "[p]rofessional or *1197 medical incompetency," 37:1285(12); "[u]nprofessional conduct," 37:1285(13); "[c]ontinuing or recurring medical practice which fails to satisfy the prevailing and usually accepted standards of medical practice in this state," 37:1285(14); and "[i]nability to practice medicine with reasonable skill or safety to patients because of mental illness or deficiency; physical illness, including but not limited to deterioration through the aging process or loss of motor skills; and/or, excessive use or abuse of drugs, including alcohol." 37:1285(25).
Dr. Patrick McClain testified as an expert in the field of addictive medicine. He stated that alcoholism is a gradual disease that progresses over a lengthy period. By the time it develops to the stage where an individual's professional life is affected, it is in a chronic state. At that point, compensatory mechanisms can no longer disguise the problem and the individual becomes florid and outwardly manifests the illness.
At trial Dr. Russell Levy testified that it was the opinion of the medical review panel that, if Dr. Williams were under the influence of a foreign substance, it would have been a breach of the standard of care for him to have performed the surgery. When asked whether a doctor suffering from alcohol or drug dependency has an affirmative obligation to relay this to the patient, he answered, "I certainly think that if a physician or anybody in a position of life and death over someone knows that they're suffering from this condition, they should at least let this person know that they have these problems."
Adele C. Williams, defendant's former wife testified reluctantly. She had physically separated from Dr. Williams in September, 1984. Prior to that time he had been abusing alcohol to the point where it was impeding his judgment, made him verbally abusive, and hindered his ability to function. While the couple were living together, defendant was drunk at home a large portion of the time. As a result of excessive alcohol use he had lost the ability to think rationally and arrive at logical decisions concerning home and family. Dr. Williams' condition had progressively worsened over time. In Mrs. Williams' opinion he did not have the ability to practice orthopaedic surgery in late 1984.
In connection with this testimony plaintiff introduced a 1986 divorce pleading containing detailed allegations that Dr. Williams has "been a heavy drinker, which for the past several years, has steadily progressed to a serious alcohol and, of late, drug dependency" and which cited specific examples of his bizarre and irrational behavior as a result of alcohol and drug abuse.
In plaintiff's case-in-chief Rubinell Hidding testified that she was never told that Dr. Williams was functioning under a handicap because of alcohol abuse prior to her husband's operation. If she had been informed she would have asked for more help in surgery.
Dr. Williams testified in his own behalf. He stated that he is not dependent on alcohol and has never been an alcohol abuser. He contended that the license suspension was based on unsubstantiated hearsay.
In evaluating all of the evidence, the trier of fact chose to rely most heavily on the testimony of defendant's former wife:
As to the specific evidence that Dr. Williams was in fact suffering from alcohol abuse, the Court finds the testimony of Adele C. Williams, the former wife of Dr. Williams, to be persuasive on this point. Adele Williams testified that she was married to defendant from December, 1956, until 1984, 28 years. She testified that Dr. Williams was drunk a large portion of the time when he was home. His former wife testified that her husband's performance along with his ability to function, was affected by his alcohol abuse. She testified that his condition was deteriorating and getting progressively worse.
The Court believes that Adele Williams was very credible and truthful. She was reluctant to be a witness against her former husband and was clearly unhappy to have to testify against her husband or to be a witness in this litigation. The *1198 Court felt her testimony was truthful and without malice or bias.
The district judge found as a matter of fact that Dr. Williams abused alcohol at the time of Paul Hidding's surgery. Based on both fact and expert testimony the court concluded that this condition presented a material risk to the patient, the increased potential for injury during surgery, that was not disclosed. Had the risk been disclosed, Mr. and Mrs. Hidding would have selected another course of treatment. Thus by failing to disclose his chronic alcohol abuse Dr. Williams violated the informed consent doctrine. Hondroulis, 553 So.2d at 421. These factual findings are based on a determination of witnesses' credibility and are entitled to great deference; they are not clearly wrong. Rosell v. Esco, 549 So.2d 840 (La.1989).
The district court with the benefit of lay and expert evidence found that Dr. Williams had breached the applicable standard of care in failing to inform Mr. Hidding of the risk of injury associated with surgery, and of the doctor's own prolonged alcohol abuse. We have viewed these factual findings guided by the precepts of Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). Our review of the evidence shows no manifest error in the district court ruling. The trier of fact was justified in his conclusion that Dr. Williams breached the informed consent doctrine. Mart v. Hill, 505 So.2d 1120 (La.1987).
For the foregoing reasons, the district judgment in favor of plaintiff Rubinell Hidding is affirmed. Costs are to be borne by Appellants.
AFFIRMED.
GRISBAUM, J., concurs with written reasons.
WICKER, J., concurs.
GRISBAUM, Judge, concurring with written reasons.
I agree with the majority and the trial court's analysis in its Reasons for Judgment that a doctor's failure to inform his patient that he suffers from an alcohol or any other related substance abuse problem constitutes defacto a breach of the "intent" of the informed consent statute. However, it appears that the majority and the trial court went to great lengths in elaborating upon the fact that (1) in this case there was the existence of a material risk which was unknown to the patient and that (2) there was a failure to disclose that risk on the part of the physician and that (3) no doubt this want of disclosure would have led a reasonable patient in the plaintiff's position to reject the medical procedure or at least choose a different course of treatment. However, neither the majority nor the trial court addressed the last and most vital inquiry, which is necessary to prove a breach of the Uniform Consent Statute and that is the question of injury. Both the majority and the trial court seem to imply that, if there is a breach of the informed consent statute and a resulting injury, then (automatically) liability attaches. In other words, a cause-in-fact relationship between failure to disclose and injury appears unnecessary. On this conclusion, I disagree. After reviewing this record in its entirety, I am convinced there was a reasonable factual basis to conclude that Dr. Williams, at the time of the operation in question, was a practicing alcoholic. From this factual scenario, I suggest the gut question proposed is simply this: whether a professed and practicing alcoholic can operate upon any patient without breaching his standard of care. In other words, if there is a resulting injury and the doctor performing the operation is a practicing alcoholic and this alcoholism is not disclosed to the patient prior to the surgery, do we have liability? Given this factual scenario and considering the record in its entirety, I say, "Yes." Ergo, this question must be viewed on a case-by-case basis.
WICKER, Judge, concurring.
I agree we should affirm the judgment in favor of plaintiff, Rubinell Hidding on the basis Dr. Williams failed to adequately advise Mr. and Mrs. Hidding of the material risks of lumbar surgery, i.e., bowel and bladder dysfunction. However, I express no opinion as to whether a failure to disclose *1199 an alcohol abuse problem is a violation of the informed consent statute rather than actionable on negligence grounds as I do not view the resolution of this issue to be compelled by the present posture of this case.