709 So.2d 798 (1998)
Christine C. BOUDOIN and Richard Boudoin
v.
CRAWFORD AND MARSHALL, LTD. (A Medical Corporation) and Byron E. Crawford, M.D.
No. 97-CA-224.
Court of Appeal of Louisiana, Fifth Circuit.
January 14, 1998.
*799 C. Scott Carter, Carter & Taylor, Metairie, for Plaintiffs/Appellants Christine C. Boudoin and Richard Boudoin.
Edward A. Rodrigue, Jr., Charles A. Boggs, Anne E. Medo, Boggs, Leohn & Rodrigue, New Orleans, for Defendants/Appellees Stewart Nutting, M.D., St. Paul Fire and Marine Company And Cardiovascular Surgery Associates, Inc.
BOWES, Judge.
Plaintiffs, Christine and Richard Boudoin, appeal a judgment of the district court in favor of defendants, Byron Crawford, M.D.; Crawford and Marshall Ltd.; Stewart Nutting, M.D.; Cardiovascular Surgery Associates Inc.; and James McCullough, M.D., and their respective insurers. For the following reasons, we affirm.
The following facts are supported by the record in this case: On September 11, 1991, Mrs. Boudoin was hospitalized in Doctors Hospital in Jefferson Parish for complaints of sweats, low grade fever, loose stools, nausea, burning esophagus, coughing up or vomiting blood, and chest pain. Dr. Melvin Gold, her treating physician and a gastroenterologist, had chest x-rays taken. The x-rays were interpreted by the radiologist, Dr. Dian Sanders, as follows:

*800 Consolidating pneumonia of the posterior segment of the right upper lobe. Consider the possibility of a central neoplasm.[1]
On September 13, a CT scan of the chest was performed which confirmed the presence of a solid soft tissue mass which had "CT characteristics of neoplasm." The impression of the same radiologist:
Findings are most consistent with right upper lobe pulmonary neoplasm, involving the mediastinum.
A lung scan, interpreted by radiologist Dr. Myron Schnieder, showed findings consistent with a pulmonary mass. Dr. Gold consulted with Dr. McCullough, a pulmonologist, who performed two bronchoscopy procedures on Mrs. Boudoin. The first procedure, the results of which were interpreted by Dr. Crawford, did not reveal the presence of any malignant cells; in the words of Dr. McCullough, it was non-diagnostic, meaning that there was no diagnosis.
Because there was a mass in the patient's chest and no diagnosis, a fine needle aspiration biopsy was performed, which again did not show any malignancy. He recommended a second needle biopsy which Mrs. Boudoin refused. Dr. McCullough consulted with Dr. Nutting, a cardiovascular/thoracic surgeon. A repeat bronscopy was performed by Dr. McCullough and the cell washings and brushings were again interpreted by Dr. Crawford. This time, Dr. Crawford reported findings as follows:
1. Bronchial brushing, right lower lobe rare severely atypical epithelial cells suggestive of poorly differentiated squamous cell carcinoma.
2. Bronchial washingsSquamous cell carcinoma in situ.
During this time, Mrs. Boudoin was being treated for pneumonia with the antibiotic Ciproflaxin. Because of plaintiff's history as a smoker,[2] because of her symptoms, and because of the x-ray and CAT scan results, Dr. McCullough felt that Mrs. Boudoin had lung cancer; however, he felt that a biopsy was needed for a definite diagnosis. Dr. McCullough noted that he did not think, initially, that Mrs. Boudoin was (due to her emotional state) a good candidate for a pneumonectomy (surgical lung removal); however, he eventually cleared her for the surgery.
On September 25, 1991, Dr. McCullough and Dr. Nutting met with the Boudoins and their adult daughter, Mrs. Mary Burchaell. Mrs. Boudoin was told that he was afraid that she had cancer, and the possibility of surgery was discussed. Dr. McCullough told plaintiff that a biopsy was needed for a definitive diagnosis and noted that he had a long talk with the Boudoins, telling Mrs. Boudoin that even with a pneumonectomy, there was a chance that there would be tumor left behind.
Mrs. Boudoin checked out of the hospital on September 25 to consider surgery. On October 1, 1997, she returned to the emergency room at Doctor's Hospital for congestion, wheezing, nausea, and vomiting and was admitted to the hospital. Dr. McCullough's admitting notes indicate that Mrs. Boudoin suffered from squamous cell carcinoma of the lung and had been previously discharged to consider surgery. She was aware, according to the note, that her situation may have been anything from a pneumonectomy to unresectable cancer.
Mrs. Boudoin had, in fact, decided to have surgery, but the operation was delayed due to her continuing problems. Her chest pains were increasing, although her pneumonia was clearing. Her general health improved, however, and on October 7, 1991, she signed a Surgical Consent Form in which she agreed to surgery to a thoracotomy and a possible pneumonectomy, or in plain English, to have the tumor removed from her right lung and possible removal of the lung itself.
On October 8, 1991, a second set of x-rays was taken prior to surgery. That set of x-rays showed a "marked reduction" in the right upper lobe pulmonary mass, and "presumably, the patient has undergone radiation." Dr. McCullough did not advise Mrs. *801 Boudoin of the change in the x-rays because the change in the x-ray was the expected finding due to the clearing pneumonia. He did not interpret the film as showing a decrease in the neoplasm which was the suspected tumor. He saw nothing on the x-ray which would have led him to change his recommendation of surgery. Dr. Nutting also viewed the x-rays prior to surgery and was concerned with the lateral viewthis view showed the tumor was still present and had not reduced in size. Because of the increasing pain, Mrs. Boudoin was getting worse.
Therefore, surgery was performed; Dr. Nutting attempted to take a biopsy, but because of the location of the tumor, he was unsuccessful. The mass was in the hilar region, a portion of the lung where vascular structures join the pulmonary artery in the left atrium and where the windpipe branches and sends its main branch to the right or left lung. With the preoperative diagnosis of carcinoma, he proceeded to remove the right lung. However, a post-surgical biopsy showed no evidence of cancer.

ACTION IN THE TRIAL COURT
In September, 1994, Mr. and Mrs. Boudoin filed suit in the Twenty-Fourth Judicial District Court against defendants, Crawford and Marshall Ltd. and Byron Crawford M.D. The petition alleged that Dr. Crawford reviewed and diagnosed several pathology and cytology specimens obtained from Mrs. Boudoin, and that he negligently interpreted and misdiagnosed specimens as positive for cancer when, in fact, no cancer was present. It was also alleged that Dr. James McCullough and Dr. Stewart Nutting recommended surgery to remove plaintiff's right lung, and that on October 8, 1991, Mrs. Boudoin underwent the recommended procedure. Post-surgical tests revealed that plaintiff was negative for cancer and had been misdiagnosed. As a direct result of the mis diagnosis, plaintiff alleged that she suffered damages.
Defendant filed an exception of prematurity alleging that plaintiff had not fulfilled the condition precedent of La.R.S. 40:1299.41.[3] The record does not show that this exception was ever disposed of by the trial court; however, the record does show that a medical review panel was invoked, and a determination issued in March, 1994.
Plaintiff filed her next pleading which was a supplemental and amending petition, in April of 1994. In that petition, Drs. Nutting and McCullough, and their respective insurers, were added as defendants, along with Cardiovascular Surgery Associates Inc., the professional medical corporation which employed Dr. Nutting. It was alleged that Dr. McCullough, who was plaintiff's primary care physician relative to her lung problems, performed two bronchoscopy procedures on plaintiff to obtain the specimens which Dr. Crawford misdiagnosed. The petition averred that Drs. McCullough and Nutting conferred with plaintiffs and that Dr. Nutting advised Mrs. Boudoin that she had lung cancer, and should have surgery within two weeks. It was urged that Drs. McCullough and Nutting negligently, and or carelessly, failed to properly care for, treat, and monitor Mrs. Boudoin, failed to properly diagnose and failed to provide medical care consistent with her condition.
In addition to the above allegations, plaintiff averred that Drs. Nutting and McCullough failed to disclose to plaintiff all known and material information necessary for her to make an informed decision. The allegations against Dr. Crawford were reiterated, and plaintiff further averred that La.R.S. 40:1299.41 was unconstitutional.
Trial was held over a seventeen day period, following which the trial court took the matter under advisement. Ultimately, judgment was rendered in favor of the defendants and dismissed plaintiffs' claims.
Plaintiffs have appealed the judgment of the trial court only as against Dr. Nutting and Cardiovascular Associates, and have dismissed their appeal as against the other defendants. Specifically, plaintiffs have alleged the following assignments of error:

*802 1. The trial court made an error of law in considering the issue of informed consent from the point of view of the physician rather than from the point of view of the reasonable patient. Plaintiffs contend such error of law requires reversal after a de novo review of the record.
2. The trial court erred in failing to find Dr. Nutting liable under the doctrine of res ipsa loquitur.
3. The court erred in failing to award substantial damages to plaintiffs.
4. The trial court erred in failing to find that Mrs. Boudoin is a patient in need of future medical care and related benefits.

REASONS FOR JUDGMENT
In his reasons for judgment, the trial judge specifically found that Mrs. Boudoin refused to undergo a second needle biopsy, and that the second bronchoscopy showed the diagnosis of the bronchial washings was "severely atypical cells suspicious of carcinoma," and on the bronchial brushings the diagnosis was "carcinoma in situ." Thereafter, Dr. McCullough and Dr. Nutting met with Mr. and Mrs. Boudoin and recommended lung surgery.
The court went on to find that during the second hospitalization, Mrs. Boudoin's chest pains were increasing and Dr. Nutting proceeded with the surgery on October 8, 1991. On the day of surgery, a chest x-ray was taken with lateral and PA (postal anterior) views. While the x-rays revealed resolving pneumonia, the lateral films clearly showed the tumor. After the surgery in which the right lung was removed, cancer was not found in the biopsy specimen.
The court found that neither Dr. McCullough nor Dr. Crawford deviated below the acceptable standards of care. In considering the totality of the testimony, the court concluded that the x-rays taken on the day of surgery did not impress Dr. Nutting, that it was his professional opinion that surgery was warranted to address the tumor, and that there was no need for further consultation with the family. While the court sympathized with the family, the doctors were found to have exercised their best judgment and to have administered reasonable care.

ANALYSIS
Our Supreme Court has recently reiterated the standard of review on appeal in Syrie v. Schilhab, 96-1027 (La. 5/20/97), 693 So.2d 1173 as follows:
A court of appeal may not set aside a trial court's finding of fact in the absence of `manifest error' or unless it is `clearly wrong.' This court has announced a two-part test for the reversal of the factfinder's determinations: (1) the appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and (2) the appellate court must further determine that the record establishes that the finding is clearly wrong (manifestly erroneous). The issue to be resolved by the reviewing court is not whether the trier of fact is right or wrong but whether the factfinder's conclusion was a reasonable one. Where the testimony of expert witnesses differ, it is the responsibility of the trier of fact to determine which evidence is the most credible. The reviewing court must always keep in mind that if the trial court's findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even if convinced that had it been sitting as trier of fact, it would have weighed the evidence differently.
[Citations omitted].
When the court of appeal finds that a reversible error of law or manifest error of material fact was made in the trial court, it is required to redetermine the facts de novo from the entire record and render a judgment on the merits. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989); Lasha v. Olin Corp., 625 So.2d 1002 (La.1993); Cooper v. Diamond Offshore Drilling, Inc., 96-924 (La. App. 5 Cir. 3/25/97), 692 So.2d 1213.

INFORMED CONSENT
La.R.S. 40:1299.40 states in pertinent part:
A. (1) Notwithstanding any other law to the contrary, written consent to medical treatment means a consent in writing to *803 any medical or surgical procedure or course of procedures which: sets forth in general terms the nature and purpose of the procedure or procedures, together with the known risks, if any, of death, brain damage, quadriplegia, paraplegia, the loss or loss of function of any organ or limb, of disfiguring scars associated with such procedure or procedures; acknowledges that such disclosure of information has been made and that all questions asked about the procedure or procedures have been answered in a satisfactory manner; and is signed by the patient for whom the procedure is to be performed, or if the patient for any reason lacks legal capacity to consent by a person who has legal authority to consent on behalf of such patient in such circumstances. Such consent shall be presumed to be valid and effective, in the absence of proof that execution of the consent was induced by misrepresentation of material facts.
The entire issue of informed consent in the present case has mutated over the course of the trial and on appeal, and presents different, if related questions. At trial, Mrs. Boudoin initially claimed that she did not sign a consent form which included the written possibility of removal of her lung, averring that the sentence which read [that the nature and purpose of the operation and probability of risks were] "to remove the tumor from right lung and possible removal of lung" was added after she signed the form. She also stated that the medical term "pneumonectomy" [in that portion of the consent form which authorized specific surgical procedures] was added to the form after her signature. However, she later retreated from that position, stating that she "didn't know about the alleged additions," and instead maintained that she would never have consented to have a lung removed, and even if she had been found to have had cancer, she would have preferred to die from that disease rather than lose her lung. She further stated that if she had known of the change in her x-ray taken on the day of surgery she would not have had the operation, but would have gotten another opinion.
On appeal, plaintiffs-appellants urge that Dr. Nutting did not obtain Mrs. Boudoin's informed consent for removal of her right lung for alleged lung cancer when no cancer was present. The issue on appeal is presented (based on the second set of x-rays taken on the day of surgery) as the failure of Dr. Nutting to advise Mrs. Boudoin that there was a material risk that she did not have cancer and that, therefore, Nutting breached his duty to use reasonable care and diligence by failing to disclose all known and material information necessary for plaintiff to make an informed decision.
In support of its position that the trial judge made an error of law in not considering the issue of consent from the point of view of the reasonable patient, plaintiffs cite the portion of the reasons for judgment in which the trial judge found that the chest x-rays taken on the day of the surgery did not impress Dr. Nutting, and that it was his professional opinion that the surgery was warranted to address the tumor without further consultation with the family. According to plaintiffs, those statements prove that the court considered informed consent from the point of view of the reasonable surgeon, rather than from the point of view of the reasonable patient.
In the present case, we do not find that the trial judge made an error of law by applying the wrong standard on the issue of informed consent. The informed consent doctrine is based on the principle that every human being of adult years and sound mind has a right to determine what shall be done to his own body. LaCaze v. Collier, 434 So.2d 1039 (La.1983). A doctor is required to provide his patient with sufficient information to permit the patient himself to make an informed and intelligent decision on whether to submit to a proposed course of treatment. Where circumstances permit, the patient should be told the nature of the pertinent ailment or condition, the general nature of the proposed treatment or procedure, the risks involved in the proposed treatment or procedure, the prospects of success, the risks of failing to undergo any treatment or procedure at all, and the risks of any alternative method of treatment. LaCaze, supra; Hidding *804 v. Williams, 578 So.2d 1192 (La.App. 5 Cir.1991).
In a trial on the merits of a suit for inadequate disclosure of risk information by a physician, the patient must provide evidence to establish, prima facie, the essential elements of the cause of action. The plaintiff patient bears the burden of persuasion on these elements: (1) the existence of a material risk unknown to the patient; (2) a failure to disclose the risk on the part of the physician; (3) that disclosure of the risk would have led a reasonable patient in plaintiff's position to reject the medical procedure or choose a different course of treatment; (4) injury.

Hidding, supra.

A risk is material if a reasonable person in the patient's position would likely attach significance to the risk or cluster of risks in deciding whether or not to forego the proposed treatment. Hondroulis v. Schuhmacher, 553 So.2d 398 (La.1988).
Generally, courts adopting a patient-based standard of disclosure have also adopted an objective test for determining causation. Such a test seeks to determine whether a reasonable person in the patient's position would have consented to the operation if full disclosure had been made. While a subjective test may better protect the patient's right to self-determination, an objective test is consistent with a disclosure requirement based on the informational needs of a reasonable patient and what such a reasonable patient would consider important in making a decision. An objective standard to determine whether the patient, fully informed of the risks, would have undertaken the proposed treatment, is consistent with general tort law and relieves the physician from the dangers of aberrational decisions on the part of the patient.

LaCaze v. Collier supra.

See also Roussel v. Sharp, 569 So.2d 67 (La.App. 4 Cir.1990); Yahn v. Folse 639 So.2d 261 (La.App. 2 Cir.1993).
The record of the trial in these proceedings show that the trial judge did apply the proper standard of the average reasonable patient on the issue of informed consent. Ruling on an objection made during the testimony of Mrs. Boudoin regarding her consent to the operation, the trial court quoted the portion of Hidding which referred to "a reasonable person in the patient's condition" case, supra, and stated that he would determine the question of that reasonableness at the conclusion of trial. Counsel for Dr. Nutting specifically questioned the court: "Do we understand your ruling is that you are going to implyapply the average reasonable patient standard and to the facts of the case?" to which the court replied "Yes, yes." Therefore, we do not find it necessary to review the record de novo, but rather we are bound by the manifest error standard of review.
The consent form clearly shows that Mrs. Boudoin consented to a possible pneumonectomy, or in plain English, the possible removal of her right lung. Mr. Boudoin testified at trial that at the meeting with Drs. Nutting and McCullough, Dr. Nutting stated that he would almost surely have to remove part of Mrs. Boudoin's lung, although he didn't know how much needed to be removed until surgery. Dr. McCullough testified that his notes reflect that he had a long talk with Mr. and Mrs. Boudoin, and told them that he was afraid that she had cancer, and that her pulmonary functions were borderline adequate, and that there was a chance that even with a pneumonectomy she would have tumor left behind. Dr. McCullough testified as follows:
I went out of my way to explain things to Mrs. Boudoin. I spent an unusual amount of time going over the same facts on a daily basis, and sometimes more than once a day. There was no doubt in my mind that she comprehended the situation and the steps that I recommended to remedy the situation, and the options and possibilities that might confront the surgeon.
Dr. Nutting testified that in this particular case the patient had all the procedures and risks explained before she went home and thought about it, returning for the surgery later. She was told that she most likely had lung cancer, and that the best and highest chance of cure is surgical excision "whatever *805 that would require." From the CAT scan, there was even a question as to whether the tumor could be removed at all, and there was a possibility that it could not be taken out. Hospital admission notes on October 1, 1991, which were part of the hospital records admitted into evidence, show that Mrs. Boudoin was aware that her situation may be anything from a pneumonectomy to unresectable cancer. In conclusion, there was no evidence presented to show that the written consent was induced or obtained by misrepresentation of material facts.
The issue on appeal then is whether or not the average reasonable patient would have continued in this consent following the second set of x-rays which appeared to evidence an improvement in the plaintiff's condition. While the possibility of not having cancer cannot be viewed as a risk (as postured by plaintiffs), it must surely be regarded as important information to which a patient is entitled. The question for the court to determine then becomes, did the second set of x-rays reveal a material change in the condition for which Mrs. Boudoin consented to have surgery? The trial judge found that it did not.
Under the jurisprudence cited hereinabove, the plaintiff must prove that the fully informed, reasonable person in the patient's condition would have refused the operation, e.g., LaCaze, supra; Hidding, supra. It is at this point that the second set of x-rays becomes an issue. We have carefully reviewed the testimony and evidence of record; however we have omitted synopsizing those portions of testimony which refer to and discuss the alleged negligence of Drs. Crawford and McCullough.
A copy of the radiologist's report on the second set of x-rays was admitted into evidence. The report stated that there was a marked reduction in the size of the previously described right pulmonary neoplasm. The mass was in the hilar region of the lung.
Plaintiff's expert medical witness Dr. Lynn Harrison, a cardiothoracic surgeon who was a member of the medical review panel in the present matter, testified that in view of the substantial changes on the two sets of x-rays, he would probably have ordered a repeat CAT scan on Mrs. Boudoin and discussed the case with the pulmonologist before performing surgery. He had experienced masses in the hilar region that he could not biopsy, because they frequently distort the normal lung anatomy, with pulmonary arteries and veins hidden by lung tissue. A biopsy in this area can be hazardous and could convert an elective procedure into a potentially life-threatening operation. Dr. Harrison stated that the suspicious mass had decreased in density, but not in size; it was difficult to tell from the x-ray. He said he would still have suspected cancer, but would have contacted the pulmonologist to discuss the possibility of more studies before proceeding. He stated that the medical review panel had found that a biopsy of the tumor where it was located would have added considerable increased hazard of the procedure and based on clinical presentation, there was sufficient evidence of cancer to warrant proceeding without a biopsy; and that Dr. Nutting was justified in removing the lung based on his operative findings and the clinical presentation of the patient.
Dr. William Samuelson, also called by plaintiffs, a physician board certified in internal medicine, pulmonary medicine, and critical care, testified that the shrinkage in mass of the second x-ray was very impressive, and the patient should have been told of the improvement, since such information impacts on consent. He felt that there was some question in assuming there was pneumonia and a tumor, and the dramatic improvement "makes you worry that it's not a tumor at all." However, in the face of all the symptoms and test results, it was reasonable after the second x-ray for a physician to continue to entertain the possibility of a tumor. The recommendation for surgery was reasonable, but the tumor would not have been moving rapidly and a delay of even a couple of weeks would not have made a difference. If there is uncertainty as to whether a tumor is malignant or benign, then removal is the appropriate course.
Dr. Daniel Knauf, a physician who was board certified in general surgery and thoracic surgery and an academic surgeon at the University of Florida, testified on behalf of *806 plaintiffs that Dr. Nutting deviated from the standard of care and contributed to the unnecessary removal of plaintiff's lung. As a result of the second x-ray, the surgery should have been canceled and another diagnostic test, such as a CAT scan, been performed. Mrs. Boudoin should have been informed of her improving x-ray, and Dr. Nutting should have taken a biopsy before removing the lung. If he was able to remove the lung, he should have been able to do the biopsy. He would have concluded, based on the tests and the symptoms and history of Mrs. Boudoin, that she probably had cancer, and that surgical removal is the best treatment. However, he had a problem with taking her to surgery following the second set of x-rays, which were a major red flag that should have caused the surgeon to confer with the pulmonologist and order further tests. There was no harm in waiting up to six weeks to see what would progress.
Dr. Bennett deBoisblanc, an expert in pulmonary diseases and critical care and associated professor at LSU Medical School, treated plaintiff for problems after the surgery in question. It was his opinion that Mrs. Boudoin should have been told about the changes in her x-rays as part of material information which would impact her decision to have surgery. He felt that one could not tell from the x-rays whether the infiltrate seen was a tumor or pneumonia; however, the second lateral x-ray was abnormal, and he could not exclude a mass. Given all the test results and symptoms and history of the patient, he would be very suspicious that there was cancer. He felt that if a CAT scan had been done on the day of surgery, a dramatic improvement in the size of the mass would have been shown.
Dr. Philip Cagle, an associate professor of medicine and Director of the center for pulmonary pathology at Baylor College of Medicine in Houston, testified by deposition. Dr. Cagle is involved in lung cancer research and has numerous memberships in medical societies and organizations, as well as many honors and awards, to his credit. Dr. Cagle concluded, based on the medical reports he reviewed, that Dr. Crawford fell below the standard of care in his pathology analysis. However, he also opined that the mass in Mrs. Boudoin's chest was an inflammatory pseudo tumor. This pseudo tumor is not a cancer, but involves pneumonia and immune cells that react in a benign process; these form a mass in the lung and mimic a tumor. These pseudo tumors do not require surgery. Most of these pseudo tumors are excised to rule out cancer, and most patients are cured by excision of the lung mass. However, a diagnosis should be attempted beforehand. Dr. Cagle did not review the x-rays. However, he felt that if the diagnosis by the pathologist was of cancer, the patient must have some procedure to save her life, and unless the treating physicians have some reason to think the pathologist is wrong, the hands of the surgeon or pulmonologist are forced into some type of definitive treatment.
Dr. Nutting testified at trial that the tumor showed up clearly on the initial lateral chest x-ray along with the pneumonia; the CAT report confirmed the presence of a mass with characteristics of a neoplasm. Based on this information, there was a likely diagnosis of cancer. Dr. Crawford's biopsy report was another piece of the puzzle, suggesting that the cells found were very close to being cancer cells. Even without the report, from all the information the doctors had, a diagnosis of cancer was still appropriate.
Although the second set of x-rays showed that the pneumonia was resolving, that was the expected find since Mrs. Boudoin was being treated for pneumonia. The films showed that the tumor had not improved. It was his job to treat the tumor, not the pneumonia, therefore, the x-rays didn't change the treatment plan. He did not inform Mrs. Boudoin of the x-ray findings because the bottom line was that the tumor, most likely cancer, was still there. The improving pneumonia was irrelevant to that fact. Had he told her of the improving pneumonia, there was no question the tumor would still need to be surgically removed. Surgery was not delayed because there was still a history that was suggestive of something sinister going on in the chest. The fact that prior to surgery she was still having severe chest pain, although the pneumonia *807 was resolving, was clinically viewed as an advancement of the tumor. There was no reason to put the surgery off, the tumor needed to come out to prolong the patient's life.
Dr. Nutting attempted to do an intraoperative biopsy, but it soon became apparent that the area was very congested; he could feel the mass, but could not see it because of vital tissue between the surgeon and the abnormal tumor. The tumor was in the hilar region, an area in which a biopsy could not be made without removing the whole lung. He was able to free the tumor away from the esophagus and the aorta, but some vital tissue would have had to have been dissected, including major arteries. He removed the entire lung instead of part of the lung because when, as in the present case, the tumor gets into the center region of the chest, the only way to get a margin of tissue that is free of tumor is to remove the entire lung.
Dr. McCullough testified that the decrease in the size of the infiltrate was an expected finding that was due to the clearing of the pneumonia, but the symptoms were not improving. Mrs. Boudoin had worsening chest pain, and Dr. McCullough was concerned that she might not be helped even with the resection, but felt that "we needed to take a look." He did not think initially that she was a good candidate, emotionally, for a pneumonectomy, but eventually he cleared her for surgery. The second set of x-rays did nothing to change his mind, and he saw no reason to discuss them with plaintiff. He could not have told Mrs. Boudoin, based on all the information including the second set of x-rays, that he thought the tumor had shrunk, or that it wasn't cancerous.
Dr. Harry Roach, a cardiovascular and thoracic surgeon, testified on behalf of the defendants. He examined the records of the hospitalizations of Mrs. Boudoin and the depositions of the other physicians and of the plaintiffs. In looking at the first x-rays, he saw a mass suspicious for lung neoplasm. In the second set of x-rays, the infiltrate (pneumonia) had improved, but there was still a mass on the x-ray which appears approximately the same size as on the earlier film. While the x-rays showed the pneumonia had improved, there does not appear to have been any change in the suspicious mass, and considering all the tests, Dr. Roach thought the patient should be considered to have lung cancer and should be operated upon. If, during surgery, he was not able to safely perform a biopsy, he would proceed with whatever magnitude of lung resection it took to remove that tumor, whether it be a lobectomy or pneumonectomy.
Dr. Tod Englehardt, a cardiovascular and thoracic surgeon who was formerly associated in practice with Dr. Nutting, testified that the improved x-ray was consistent with the resolving pneumonia, as a result of continuing treatment with an antibiotic. However, the resolving pneumonia would not have changed a decision to go forward with the operation and he would not have informed the patient of the x-rays because the tumor had not changed. There would be concern because the pain had increased while the pneumonia was decreasing. The next step would be to get a biopsy or proceed with the resection of the tumor. The post-surgical pathologist report showed a mass on the lung, although whether or not it was a malignant cancer he could not opine. This would be the tumor that showed up on the x-rays. He felt that the amount of time which Dr. Nutting spent in surgery, about twice as long as normal, evidenced that there was some deliberation on his part as to how to proceed.
Dr. Robert Velez, a general surgeon who routinely does 10-20 pulmonary resections a year, testified that in viewing the two sets of x-rays, the second set shows a resolution of the infiltrate, but also the persistence of a mass lesion, partially on the lateral film. Considering all the information available to the surgeon at the time, Dr. Velez felt there was an obligation to pursue a thoracotomy and diagnosis and resection of the mass. The option would be watching and waiting, at which time the patient might lose her opportunity for surgical cure. He had some experience in situations in which a biopsy of the hilar region could not be taken.
Dr. William Stein, an oncologist, testified that Mrs. Boudoin displayed a number of symptoms which might be referable to cancer, such as loss of appetite, difficulty swallowing, *808 chronic cough, low grade fever, difficulty breathing, spitting up blood etc. She also had a history of smoking. The first x-rays showed a mass in her chest and combined with the symptoms, Dr. Stein would be highly suspicious of malignancy. He would have assumed that the mass was cancer, until proven otherwise. The second set of films showed a residual infiltrate with a well circumscribed mass noted in the same position it was in the previous film, and essentially the same size. That fact, along with the continuing chest pain, would increase his concern that the mass represents a malignancy. A delay in the surgery would not serve any purpose. He would not have told her about the improving pneumonia with the continuing mass because it didn't materially affect her current situation. If, considering the facts of the case, he had gotten a call that the patient was on the operating table but could not be biopsied, he would have instructed the surgeon to take out the tumor. Withholding information on the x-rays did not detrimentally affect her situation.
Dr. John Onofrio, offered as a board certified expert in pulmonology, internal medicine and critical care, testified that considering all the pertinent information, the second set of x-rays showed an improved infection or inflammation, but did not eliminate the presence of a tumor. He agreed that under all the circumstances it was not reasonable for Dr. McCullough to tell Mrs. Boudoin about the x-rays.
We have carefully considered the above information, along with the testimony of the lay witnesses, although the only lay witness whose testimony, on this issue, is relevant is that of Mrs. Boudoin. We are cognizant of the fact that Mrs. Boudoin is in distress, both physically and emotionally, and are sympathetic with her plight.
However, after reviewing the record, the jurisprudence, and the statutory law, we find that the trial judge was not manifestly erroneous in its judgment. It is clear that Mrs. Boudoin agreed to undergo surgery, including a possible pneumonectomy, because of the pre-operative diagnosis of lung cancer. Her treating physicians told her that they strongly suspected cancer, but could not be absolutely certain without a diagnosis, so that Mrs. Boudoin was indeed aware that she might not have had cancer. We cannot regard as reasonable her statements at trial to the effect that she would rather die than have her lung removed and that she would not be grateful to have had the lung removed and her life saved if she had in fact had cancer. It is clear that were those statements true, she would never have signed the consent to a possible pneumonectomy. We understand her feelings from the point of view of someone who, as it turned out, did not have cancer, but it has been said that hindsight is always 20/20, and the physician is not judged from that position.
A physician's judgment is evaluated in light of facts known at the time of a patient's treatment, not on the basis of hindsight or information later learned. Moore v. Healthcare Elmwood, 582 So.2d 871, 878 (La.App. 5 Cir.1991); Alello v. Smith, 94-103 (La.App. 5 Cir. 7/26/94), 641 So.2d 664. A physician is not required to exercise the highest degree of care possible, nor is he held to an absolute standard of precision. La.R.S. 40:1299.41 A(7) reads in pertinent part:
The standard of care required of every health care provider, except a hospital, in rendering professional services or health care to a patient, shall be to exercise that degree of skill ordinarily employed, under similar circumstances, by the members of his profession in good standing in the same community or locality, and to use reasonable care and diligence, along with his best judgment, in the application of his skill.
Under La.R.S. 9:2794(A)(2), in malpractice actions a plaintiff must prove that the defendant either lacked the degree of knowledge or skill possessed by others practicing in his field, or failed to use reasonable care and diligence along with his best judgment. A physician's conduct must be reasonable under the circumstances existing at the time. Hughes v. Bailey, 29,314 (La.App. 2 Cir. 4/2/97), 691 So.2d 359; Allen v. State, 535 So.2d 903 (La.App. 2 Cir.), writ denied, 536 So.2d 1201 (La.1988); Malone v. State, Dept. of Health & Human Resources, Office *809 of Hospitals, 569 So.2d 1098 (La.App. 3 Cir. 1990).
We find that plaintiff-appellant failed to carry her burden of proving that Dr. Nutting did not use reasonable care along with his best judgment. While there was certainly expert testimony to the effect that plaintiff should have been advised of the changes in the x-rays, and that the changes were material, there was also much expert testimony that the changes did not appear to evidence an improvement in the working diagnosis of cancer. When the experts' opinions are in conflict concerning compliance with the applicable standard of care, the trial court's determinations on this issue will be granted great deference. It is the sole province of the trier of fact to evaluate the credibility of such experts and their testimony. James v. Gordon, 95-1472 (La.App. 3 Cir. 12/4/96), 690 So.2d 787; Charpentier v. Lammico Ins. Co., 606 So.2d 83 (La.App. 3 Cir. 1992). On appellate review the trial court's reasonable factual findings, reasonable evaluations of credibility, and reasonable inferences of fact should not be disturbed.
Because Mrs. Boudoin had consented to and was being operated upon to remove the diagnosed cancer, we see no manifest error by the trial court in finding that the changes on the x-ray were not material information which had to be made known to Mrs. Boudoin. Based on the evidence adduced at trial, we find that there was sufficient evidence for the trier of fact to conclude that the reasonable patient undergoing surgery for cancer of the lung would have continued in her consent to the operation following the disclosure of the second set of x-rays.

RES IPSA LOQUITUR
A panel of this Court discussed the doctrine of res ipsa loquitur in Filasek v. Doctor's Hosp. of Jefferson, 96-69 (La.App. 5 Cir. 4/30/96), 673 So.2d 1263. There we said:
The rules of res ipsa loquitur apply in any negligence action where the circumstances suggest the defendant's negligence as the most plausible explanation for the injury. The principle of res ipsa loquitur is a rule of circumstantial evidence, whereby negligence is inferred on the part of a defendant because the facts indicate this to be more the probable cause of injury in the absence of other as-plausible explanations by witnesses found credible.
In order for res ipsa loquitur to be applicable the plaintiff must show (1) the accident is of a kind that normally does not occur in the absence of negligence, (2) the accident was caused by an instrumentality in the actual or constructive control of the defendant, and (3) the information as to the true cause of the accident was more readily available to the defendant than to the plaintiff.
Res ipsa loquitur is irrelevant where a body of direct evidence is available explaining the activity leading to the injury. When it can be shown reasonably that the accident could have occurred as a result of one or two or more causes, the res ipsa loquitur rule cannot be invoked.

[Citations omitted].
The doctrine of res ipsa loquitur is to be sparingly applied and only in exceptional cases where the demands of justice make that application essential. Day v. National U.S. Radiator Corp., 241 La. 288, 128 So.2d 660 (1961); Picou v. Equifax Services, Inc., 96-819 (La.App. 5 Cir. 2/25/97), 690 So.2d 219.
Without discussing each point raised by plaintiffs on this issue, we find that the doctrine of res ipsa loquitor does not apply in the present case. The fact that Mrs. Boudoin did not have cancer does not compel the conclusion that her lung was negligently removed. There was a pre-operative diagnosis of lung cancer and the testimony discussed hereinabove proves that there was ample reason for Dr. Nutting to strongly suspect that Mrs. Boudoin did in fact have cancer at the time of surgery.
Dr. Nutting unsuccessfully attempted to perform a biopsy during the surgery. Several doctors, including Dr. Knauf, testified that it happens that a biopsy cannot be performed because of the location of a tumor. There was also testimony from several experts that it was a matter of surgical judgment whether *810 or not to proceed with the pneumonectomy without first obtaining the biopsy.
There was also expert testimony that the tumor in plaintiff's lung was an inflammatory pseudo tumor, a benign lung tumor which can mimic cancer lesions. In this case there is a body of evidence explaining the removal of Mrs. Boudoin's lung. Plaintiffs have not shown that the removal of Mrs. Boudoin's lung is an event or accident of a kind that normally does not occur in the absence of negligence. Furthermore, where there is direct evidence to show what transpired, the rule has no applicability. Filasek, supra; Tramontin v. Glass, 95-744 (La. App. 5 Cir. 1/30/96), 668 So.2d 1252. This assignment of error is without merit.
Because of our findings above, we need not address the assignments of error involving damages.
For the foregoing reasons, the judgment is affirmed.
AFFIRMED.
NOTES
[1] A neoplasm is an abnormal growth.
[2] Plaintiff was characterized as having a 55-year pack history of smoking. This means that she has smoked the equivalent of a pack of cigarettes per day for 55 years.
[3] La. R.S. 40:1299.41 requires such malpractice cases be referred to the medical panel review board.