FILED
United States Court of Appeals
Tenth Circuit

March 3, 2010

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

MARCY WILLIS,

      Plaintiff - Appellant,

 v.

D. SCOTT BENDER, M.D.,

      Defendant - Appellee.

No. 07-8057

**Appeal from the United States District Court
for the District of Wyoming
(D.C. No. 2:06-CV-00211-WFD)**

Donald J. Sullivan, Sullivan Law Offices, P.C., Cheyenne, Wyoming, for Plaintiff / Appellant.

James Kaste of Lathrop & Rutledge, P.C. (Corinne E. Rutledge with him on the briefs), Cheyenne, Wyoming, for Defendant / Appellee.

Before **O'BRIEN**, **McKAY**, and **SEYMOUR**, Circuit Judges.

**O'BRIEN**, Circuit Judge.

Dr. D. Scott Bender, a general surgeon, perforated Marcy Willis' small bowel while performing a laparoscopic cholecystectomy (laparoscopic surgery to remove her gallbladder). Relevant here, Willis sued Bender for lack of informed consent and medical malpractice. The district court granted summary judgment to Bender on the

informed consent claim. The medical malpractice claim proceeded to a jury trial. Willis

requested a "captain of the ship" jury instruction which would have

allowed the jury to hold Bender liable for his surgical assistant's negligence. The jury

found in favor of Bender. Willis appeals from the grant of Bender's motion for summary

judgment as well as the court's refusal to instruct the jury on the "captain of the ship"

doctrine. We affirm as to the "captain of the ship" jury instruction but reverse the district

court's grant of summary judgment to Bender on the informed consent claim.

## I.     FACTUAL BACKGROUND

Because we are reviewing the grant of summary judgment to Bender, we must

view the facts in the light most favorable to the non-moving party, Willis. *See Sanders v.

Sw. Bell Tele. L.P.*, 544 F.3d 1101, 1105 (10th Cir. 2008), *cert. denied*, 130 S. Ct. 69

(2009). Bender conceded as much by proceeding on his motion for summary judgment

as if Willis' allegations were true but not admitting so.

Prior to the surgery at issue in this case, Willis had undergone three abdominal

surgeries: a 1979 appendectomy, a 1991 surgery to remove scar tissue and open her

Fallopian tubes and a 2002 surgery to repair an abdominal hernia. As a result of these

surgeries, Willis had a large abdominal scar running from her diaphragm to her pubic

area and extensive abdominal adhesions.[1] Due to these adhesions, Dr. Roland Fleck, the

---

[1] Adhesions are bands of scar tissue that form as a natural part of the body's healing
process after surgery; sometimes they bind together internal organs and tissues that would
normally be separate and distinct. They can be very dense or loose and stringy. At his
deposition, Dr. Roland Fleck, the surgeon who performed Willis' 1991 and 2002
surgeries, stated that to visualize an adhesion, one should imagine placing a piece of
chewing gum between one's index finger and thumb and pulling them apart. The

surgeon who performed Willis' 1991 and 2002 surgeries, advised Willis any future abdominal surgeries should be performed using an "open" rather than "closed" or laparoscopic procedure

In late 2002, Willis visited Dr. Fleck complaining of abdominal pain. Dr. Fleck prescribed medication. When Willis' pain began interfering with her sleep, she called Dr. Fleck's office. She was informed Dr. Fleck was unavailable for several weeks. Therefore, on March 13, 2003, Willis visited a medical clinic in Alpine, Wyoming. The clinic's physician assistant referred her to Dr. Bender in Afton, Wyoming.

Willis met with Bender five days later. Bender suspected Willis' gallbladder was the source of her stomach pain. He told her if his suspicions were correct, her gallbladder would need to be removed and he would prefer to remove it laparoscopically. Willis informed Bender of her surgical history and abdominal adhesions. She also told Bender about Dr. Fleck's warning against a laparoscopic procedure and recommendation for future abdominal surgeries to be conducted by an open procedure due to her adhesions. But Bender said laparoscopic surgery is the best procedure for individuals with adhesions because it does not create additional scar tissue. Willis asked Bender about his experience and track record with the laparoscopic procedure, whether he had ever been sued and whether he had ever had any problems with his medical license. Bender told

resulting strands of gum extending from the index finger to the thumb resemble adhesions. Due to the extensive number of adhesions in Willis' abdomen, Dr. Fleck described her abdomen as a "glue belly": "[I]f you were to open up an abdomen and pour in some glue, you would then think that everything is going to stick to each other, and that's sort of a descriptive term when you have multiple adhesions between different organs in the abdomen." (R. Appellant's App. Vol. I at 142.)

Willis he had never been sued, never had any problems with his medical license and his success rate with the laparoscopic procedure was "99.9% right on the mark." (R. Appellant's App. Vol. I at 202.) Willis also asked Bender to consult with Dr. Fleck. Bender agreed to do so. Willis underwent an ultrasound examination several days later.

Approximately three days after Willis had the ultrasound, Bender called her to inform her the ultrasound revealed she had three large gallstones. During that conversation, she asked Bender if he had had the opportunity to talk with Dr. Fleck. Bender said yes and Dr. Fleck had agreed with the laparoscopic procedure. After Willis expressed hesitation with a laparoscopic procedure, Bender assured her if he could not perform the surgery laparoscopically, he would convert to an open procedure. Willis signed a consent form agreeing to the surgery.

On April 4, 2003, Willis, accompanied by her husband and sister, reported to Star Valley Medical Center (the hospital) for the surgery. Bender met with them prior to the surgery. Willis' sister asked Bender whether he was sure he could perform the surgery laparoscopically; Bender said yes. Willis' husband asked Bender if he had spoken to Dr. Fleck about the surgery and whether he had agreed with performing it laparoscopically. Bender again said he had spoken with Dr. Fleck and Dr. Fleck had agreed with the proposed surgery.

During the surgery, Bender twice attempted to enter Willis' abdomen on the right side where the gallbladder is located but encountered significant adhesions. He then moved to the left side of the abdomen where he was able to enter. Over the next two to three hours, Bender cut down adhesions to reach the gallbladder, which he proceeded to

remove. During the procedure, Dr. Donald Kirk, a family medicine physician, held and positioned the laparoscope at Bender's direction.

Willis remained at the hospital overnight. The next morning, April 5, she had severe abdominal pain and greenish drainage from the umbilical port site. A doctor at the hospital gave Willis antibiotics and told her he would try to locate Bender. Later that evening, Bender checked on Willis and decided she likely had a small bowel perforation which needed to be fixed immediately. Bender opened Willis' abdomen along her midline scar (non-laparoscopically) and discovered a 5 cm small bowel perforation which he repaired. He closed the abdomen with staples.

Willis remained in the hospital until April 11. Three days later, she returned to Bender's office to have the staples removed. When the staples were removed, the wound spontaneously opened. Because the wound was infected, Bender did not re-staple it but cleaned and bandaged it. He sent Willis home with medication and arranged for a home healthcare nurse to assist her with wound care. The next day, Willis returned to the hospital because she could not stop vomiting. Bender suspected a small bowel obstruction or an ileus (temporary non-functioning of the intestine); further testing revealed an ileus. Willis remained at the hospital until April 19, when she was transferred, at her and her husband's request, to another hospital in Idaho, where she stayed until the ileus resolved (April 24).

Willis later discovered Bender had lied to her when she asked him about his experience and track record with the laparoscopic procedure, whether he had ever been sued and whether he had ever had any problems with his medical license. Bender had in

- 5 -

fact been sued several times, including by a family of a patient who had died after

undergoing a laparoscopic cholecystectomy performed by Bender in 2001.[2] The parties

settled that case prior to trial pursuant to a confidential settlement agreement. That same

family also filed a complaint against Bender with the Wyoming Board of Medicine. The

complaint with the Board was eventually resolved, in September 2003, after Bender

agreed to and successfully completed a comprehensive assessment of his competency as a

surgeon.[3] However, at the time Willis first questioned Bender as to his medical

---

[2] The other litigation against Bender included: (1) a pro se lawsuit by a patient, who had felony convictions for defrauding the State of California, four years after Bender performed surgery to remove a malignant tumor near her heart; the case was dismissed based on the statute of limitations; (2) a lawsuit by a patient complaining she suffered from nerve damage in her leg after undergoing a skin graft performed by Bender; the case was dismissed before trial as a result of Bender being able to refute that a skin graft could cause nerve damage; and (3) a lawsuit by the family of a sixty-year-old automobile accident victim who underwent several abdominal surgeries performed by Bender and eventually died of his injuries; the case was dismissed before trial based on expert testimony stating Bender's performance met the standard of care.

[3] Bender's competency assessment involved an interview and a comprehensive examination of general surgery. The assessment revealed eight or nine areas in which Bender needed additional study; only two areas are revealed in the record: the treatment of rattlesnake bites and the treatment of tetanus prophylaxis. Bender prepared a report on those two areas, as well as the others. He then orally answered questions relating to those areas. The public disclosure by the Wyoming Board of Health regarding the resolution of the complaint said:

> Final order dated 4/11/02 wherein Dr. Bender agreed to an assessment by PLAS [Post Licensure Assessment System] and agreed to complete additional training and education if necessary. Assessment and additional education requirement completed by 8/1/03. All requirements met and file closed on 9/23/03. MEDICAL LICENSE IS FULLY RESTORED WITH NO CONDITIONS OR RESTRICTIONS.

(R. Appellant's App. Vol. I at 154.)

competence, the complaint was under investigation. Bender also lied to Willis when he told her he had spoken with Dr. Fleck who had agreed with the proposed laparoscopic procedure. Bender never called Dr. Fleck prior to the surgery.

## II. PROCEDURAL BACKGROUND

### A. The Complaint and Designation of Experts

Willis sued Bender for medical malpractice, battery and fraud. She designated Dr. Clarence Braddock, a Professor of Medicine and Medical Ethics at Stanford University School of Medicine, to provide expert testimony to support her battery and fraud claims. Dr. Braddock opined that if Bender had provided false information to Willis in response to her questions, he breached his ethical obligation to Willis and her consent to the surgery would not have been informed. In support of her medical malpractice claim, Willis designated Dr. James McGreevy, a general surgeon and professor of surgery at the University of Utah School of Medicine, as her expert. He opined the decision to remove Willis' gallbladder was valid and despite her surgical history, including Dr. Fleck's admonition to proceed with an open procedure, Bender acted reasonably in initially attempting a laparoscopic approach. He also said Bender's post-operative care of Willis, including performing the second surgery to repair the bowel perforation, met the standard of care. However, in his opinion, Bender was negligent in continuing with a laparoscopic approach after his first two attempts at gaining access to Willis' abdomen failed; Bender should have instead converted to an open procedure.

### B. Bender's Motion for Partial Judgment on the Pleadings

Bender filed a motion for partial judgment on the pleadings on the battery and

fraud claims pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. Bender argued that to the extent those claims alleged he had failed to disclose facts concerning his professional background, "no physician in the country has a duty to disclose [such] facts." (R. Appellant's App. Vol. I at 24.) Willis opposed the motion. While agreeing a doctor has no affirmative duty to disclose such facts, she claimed a doctor cannot lie when directly asked for this information and then use that false information to secure a patient's consent.

At a hearing on the Rule 12 motion, Bender amended his motion seeking only dismissal of the fraud claim as the allegations of misrepresentation were appropriately considered, if at all, under the informed consent doctrine. Although the district court agreed with Bender, stating Willis' claim appeared to be a "'garden variety' medical malpractice claim with a component of a lack of informed consent," it nevertheless denied the motion due to the fact the lawsuit was in its early stages. (Vol. I at 416.) Several months later, Willis successfully moved to amend her complaint to eliminate the fraud claim.

C.     Bender's Motion for Summary Judgment

Bender moved for summary judgment on the battery claim arguing Willis had failed to present expert testimony establishing causation. He claimed Willis had failed to show through expert testimony that his alleged misrepresentations concerning his experience and track record, litigation history and licensure problems increased the risk of the contemplated procedure or significantly increased her risk of injury. As to his alleged lying about consulting with Dr. Fleck, Bender admitted during his deposition and

at trial that he never talked to Dr. Fleck but claimed Willis never asked him to do so. He also claimed Willis never asked him whether he had been sued or whether he had any problems with his medical license. Nevertheless, Bender asserted that according to Dr. Fleck's deposition testimony, had Bender called him, he would have only told Bender to be aware Willis had extensive adhesions. Therefore, according to Bender, had he contacted Dr. Fleck and informed Willis of his opinion, a reasonable person in Willis' position would have still consented to the laparoscopic approach.

Bender also sought summary judgment on the medical malpractice claim, again arguing Willis had failed to present expert testimony establishing causation. He claimed Dr. McGreevy's opinion limited his breach to his decision to make a third attempt to enter Willis' abdomen laparoscopically. However, Willis had failed to provide expert testimony establishing that that breach caused her injury. Moreover, Bender pointed to Dr. McGreevy's deposition testimony that bowel perforation was a known and accepted complication of laparoscopic abdominal surgery. Consequently, Bender claimed there was no evidence that negligence on his part caused the bowel perforation.

D.    Willis' Opposition to Bender's Motion for Summary Judgment

Willis opposed Bender's motion. With respect to her battery claim, she asserted if Bender had told her the truth, she would not have hired him. She also argued that performing surgery on a non-consenting person constitutes negligence per se. As to the malpractice claim, Willis argued expert testimony was not necessary because a lay person is capable of understanding that bowels are not to be gashed by surgeons, surgeons should notice and repair bowel perforations, serious harm will inevitably result from a

perforated bowel if left uncorrected and corrective surgery to repair the perforation is mandatory. In any event, she pointed out Bender himself had admitted causation at his deposition—he admitted Willis' bowel perforation occurred sometime during the first surgery, the second surgery was necessary to fix the perforation and as a consequence of the second surgery, which required Bender to open her abdomen along her midline scar, she developed a wound infection and ileus. Moreover, Dr. Dennis Dove, her current surgeon in Texas, testified to the complications she suffered as a result of the second surgery.

E.     District Court's Grant of Summary Judgment to Bender on Willis' Battery/
       Informed Consent Claim

The district court granted summary judgment to Bender on the battery claim. It first concluded that claim was more appropriately analyzed under the law of negligence, specifically the informed consent doctrine. The court determined that while Wyoming's informed consent law imposes a duty upon a doctor to disclose the specific risks associated with a medical procedure or treatment, it did not impose a duty on the physician to disclose the details about his own background or experience, even if the patient asks for this information. Therefore, it held an informed consent claim based on a physician lying to a patient in response to direct questions is only actionable where the information allegedly misrepresented would otherwise fall under the scope of required disclosure, *i.e.*, the specific risks associated with a medical treatment or procedure. It reasoned:

> In insisting that the duty of disclosure be tied to the intended purpose of the informed consent doctrine, this Court does not mean to suggest that lying to

patients is without the potential for legal liability.  Instead, this decision merely recognizes the limitations of the informed consent doctrine as a catch all cause of action.  Because there are more appropriate causes of action for asserting [a] physician's ineptitude or deceit, this Court cannot allow an impermissible expansion of the doctrine of informed consent in order to provide what would often be a redundant cause of action.  There is simply no support for doing so under Wyoming law.

(R. Appellant's App. Vol. I at 244 (citations omitted).)  The court did not, however, suggest a more appropriate cause of action.

The court was also concerned that allowing an informed consent claim based on a physician lying to a patient in response to questions concerning his experience and track record, licensure problems and litigation history would have the "practical effect of bringing before the jury the type of 'prior bad act' evidence that would normally be excluded under Federal Rule of Evidence 404(b)":

A claim framed in this manner would require mini-malpractice trials within the underlying action for the purposes of proving that the physician's lack of skill (as evidenced by prior *meritorious* lawsuits, claims, or prior acts [of] surgical negligence) increased the risk to the patient of undergoing the surgery such that it should have been disclosed as part of the process of securing the patient's informed consent.

(R. Appellant's App. Vol. I at 244-45.)

Even assuming an informed consent claim could be made under these circumstances, the court concluded the claim failed because there was no expert testimony demonstrating proximate cause.  While Willis may have provided expert testimony establishing Bender's alleged misrepresentations in response to her direct questions breached the standard of care, she had failed to present expert testimony showing the withheld information increased the risks such that a reasonable person in the

- 11 -

same or similar circumstances would not have consented to the procedure had disclosure been made.

F.      District Court's Denial of Summary Judgment to Bender on Willis' Medical Malpractice Claim

The court denied Bender's motion for summary judgment on the medical malpractice claim but not without reservations.  It determined the claim was centered entirely on Bender's decision to continue a laparoscopic approach rather than converting to an open procedure after his first and second attempts to gain access to Willis' abdomen were unsuccessful.  While Willis provided expert testimony that such conduct fell below the standard of care, she failed to provide any expert testimony that such conduct actually caused the bowel perforation.  Although Bender conceded the perforation must have occurred during the laparoscopic cholecystectomy, he did not concede it was the result of any negligence.  Moreover, there was evidence that bowel perforation was a known and accepted complication of a laparoscopic cholecystectomy.  Nonetheless, giving Willis the benefit of a generous interpretation of her expert's opinions, the court found her submissions were sufficient to withstand summary judgment.  It read those submissions as alleging Bender's negligent decision to continue to proceed laparoscopically after his initial attempts failed unreasonably increased Willis' risk of undetected bowel injury.  It warned, however, that Willis' ability to survive a motion for a directed verdict was precariously tied to the presentation of expert testimony establishing her bowel perforation was in fact caused by Bender's negligence.

G.      Jury Trial on Medical Malpractice Claim

The medical malpractice claim proceeded to trial.  Based on the grant of summary judgment to Bender on the informed consent claim, Bender filed a motion in limine to exclude Dr. Braddock's testimony at trial.  While not agreeing with the court's summary judgment ruling on the informed consent claim and expressly reserving her right to challenge it, Willis agreed Braddock's testimony was not admissible at trial.  The court granted Bender's motion in limine.

Willis requested a "captain of the ship" jury instruction which would have allowed Bender to be held liable for Dr. Kirk's negligence:

> Regardless of who employs or pays a nurse or an assisting surgeon or other member of the operating team who takes part in the performance of surgery or services incidental to such surgery, if, while engaged in any such service, the assisting surgeon, the nurse or other member of the operating team, is under the direction of the surgeon in charge, so as to be his temporary servant or agent, any negligence on the part of any such assisting person, occurring while the latter is under the surgeon's direction, is deemed in law to be the negligence of such surgeon.

(R. Appellant's App. Vol. I at 314.)  The court rejected the instruction.  It did not provide explicit reasons for doing so but, based on its comments at the jury instruction conference, it appears the instruction was rejected because it lacked evidentiary support, *i.e.*, there was no evidence showing anyone other than Bender was negligent.

The jury returned a verdict in favor of Bender, finding "[his] care of Marcy Willis [did not] violate[] the accepted standard of medical care expected of him as a general surgeon[.]"  (R. Appellee's Supp. App. at 1.)

- 13 -

## III.    DISCUSSION

Willis complains the district court erroneously granted Bender's motion for summary judgment on her informed consent claim and improperly rejected her proposed "captain of the ship" jury instruction.[4]

### A.    Informed Consent

Willis admits she signed a consent form prior to the surgery. She also concedes a doctor has no affirmative duty to voluntarily disclose information to a patient about his background. However, she argues that when a patient directly asks a doctor questions germane to her decision whether to hire him, the doctor has a duty to give truthful answers. Bender did not do so and had he done so, she would have refused to hire him, waited for Dr. Fleck and undergone the less risky open procedure which Dr. Fleck knew to be necessary. Because Bender deliberately lied to her about his experience and track record, litigation history, licensure problems and consulting with Dr. Fleck in order to convince her to accept him as her surgeon and thereby run the risks of the laparoscopic procedure, Willis says her consent was not valid, much less informed.

Bender claims the district court correctly granted summary judgment in his favor on the informed consent claim. In Wyoming, the informed consent doctrine only imposes an affirmative duty upon physicians to fully disclose to the patient any serious

----

[4] Willis also argued in her opening brief that the district court improperly granted Bender's motion in limine to preclude Dr. Braddock (Willis' medical ethics expert) from testifying at trial. She withdrew this claim at oral argument because she had conceded in the trial court that the motion should be granted given the district court's grant of summary judgment to Bender on the informed consent claim.

risks involved in a contemplated procedure which a reasonable practitioner of like training would disclose in the same or similar circumstances. What risks a reasonable practitioner would disclose in the same or similar circumstances must be established by expert testimony. While Bender concedes other courts have required physicians to disclose information other than the risks, benefits and alternatives to a procedure, including a physician's conflict of interest, HIV status, substance abuse impairment and in one case inexperience with a particular procedure, he argues no court has required a doctor to disclose the information alleged here—track record, lawsuits, licensure problems and the failure to speak to the patient's doctor.

Bender further asserts Willis failed to show his alleged misrepresentations increased her risk of injury under the laparoscopic procedure or created any additional risk of injury. There is absolutely no evidence establishing Bender's success rate with the procedure in this case was worse than any other general surgeon's. He also points to Dr. Fleck's deposition testimony. Dr. Fleck did not recall Bender calling him prior to the surgery. However, Dr. Fleck testified that had Bender called him, he would have told Bender to be aware of Willis' adhesions. Dr. Fleck also said the decision whether to proceed laparoscopically or with an open procedure in a patient with adhesions is a matter of medical judgment and his recommendation to Willis that any future abdominal surgeries be performed with an open procedure was an individual preference. Based on this testimony, Bender claims that had he contacted Dr. Fleck, Dr. Fleck would not have said anything that might, objectively, result in a decision against the proposed closed procedure—had the information been conveyed to Willis, a reasonable person in her

position would still have consented to the closed procedure. In summary, Bender claims Willis failed to establish the alleged misrepresentations caused her any injury.

1.      Standard of Review

"We review summary judgment decisions de novo, applying the same legal standard as the district court." *Sanders*, 544 F.3d at 1104. Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "When applying this standard, we view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party." *Sanders,* 544 F.3d at 1105 (quotations omitted).

Because we are sitting in diversity,[5] we apply Wyoming law, including its choice of law rules. *See Vitkus v. Beatrice Co.*, 127 F.3d 936, 941 (10th Cir. 1997). "In Wyoming, the law that governs substantive aspects of a negligence action is the law of the place where an alleged tort occurred." *V-1 Oil Co. v. Ranck*, 767 P.2d 612, 616 (Wyo. 1989). Because the alleged malpractice occurred in Wyoming, we apply Wyoming law. Neither party contends otherwise. When applying Wyoming law, we must apply the most recent pronouncement of the Wyoming Supreme Court. *Royal Maccabees Life Ins. Co. v. Choren*, 393 F.3d 1175, 1180 (10th Cir. 2005). "[A] federal district court's state-law determinations are entitled to no deference and are reviewed de novo." *Blanke v. Alexander*, 152 F.3d 1224, 1228 (10th Cir. 1998). Because the

---

[5] Although Willis lived in Wyoming at the time of the alleged incident and Bender is a resident of Wyoming, Willis resided in Texas at the time she filed this lawsuit.

- 16 -

Wyoming Supreme Court has yet to decide whether an informed consent claim can be made on facts similar to those raised here, we must attempt to predict how the Wyoming Supreme Court would resolve the issue.[6] *Royal Maccabees Life Ins. Co.*, 393 F.3d at 1180.

2.      Analysis

This is, indeed, a difficult issue.  In general, a physician must obtain a patient's informed consent prior to performing a medical procedure upon the patient.  *See Govin v. Hunter*, 374 P.2d 421, 423 (Wyo. 1962).  Originally, a physician's performance of a medical procedure without the patient's informed consent constituted a battery.  *Roybal v. Bell*, 778 P.2d 108, 111 (Wyo. 1989).  While battery still "remains applicable where a treatment or procedure was completely unauthorized . . . negligence principles [now] apply to the more often encountered situation where the treatment or procedure was authorized but the consent was uninformed."  *Id.* at 111 n.4.  As the district court concluded, the laparoscopic cholecystectomy in this case was not completely unauthorized.  Therefore, we must analyze Willis' claim under negligence principles rather than the law of battery.  Under those principles, the plaintiff must prove the same elements applicable to a medical malpractice claim: (1) the physician owed a duty to the plaintiff; (2) the physician breached that duty; and (3) the breach proximately caused

---

[6] We could *sua sponte* ask the Wyoming Supreme Court to resolve this "unsettled and dispositive" issue of state law.  *Kan. Judicial Review v. Stout*, 519 F.3d 1107, 1119-20 (10th Cir. 2008) (quotations omitted); *see also* Wyoming Rules of Appellate Procedure, Rule 11.01.  But we typically take our cue from the parties and neither party has requested certification.

injury to the plaintiff.  *Id.*

In Wyoming, a physician has a duty to disclose any serious risks which are involved in a contemplated procedure.  *Govin*, 374 P.2d at 423.  The extent of that disclosure is determined under the traditional or professional view, that is, "[a] physician is required to disclose only such risks that a reasonable practitioner of like training would have disclosed in the same or similar circumstances."  *Roybal*, 778 P.2d at 112.  "[E]xpert testimony is required to establish what a reasonable practitioner would disclose in the same or similar circumstances."  *Id.*  The expert is required to state the standard of care with "specificity sufficient to enable the court to determine if [the doctor] properly disclosed the risks and alternatives in conformance with the standard."  *Id.* at 114.

The Wyoming Supreme Court has addressed informed consent in the medical malpractice context in five cases.  *See Weber v. McCoy*, 950 P.2d 548, 552 (Wyo. 1997); *Havens v. Hoffman*, 902 P.2d 219, 221-23 (Wyo. 1995); *Roybal*, 778 P.2d at 111-14; *Studon v. Stadnik*, 469 P.2d 16, 20 (Wyo. 1970); *Govin*, 374 P.2d at 423-24.  All but *Govin* involved a physician's failure to voluntarily disclose to the patient the risks associated with a particular procedure prior to obtaining the patient's consent.  *Govin* involved a physician lying to the patient concerning the risks associated with the particular procedure.  Therefore, a claim under Wyoming's informed consent law requires either (1) a misrepresentation concerning the risks of a proposed treatment or procedure or (2) a failure to voluntarily disclose the risks of a proposed treatment or procedure.  Willis' informed consent claim fits neither scenario as she is not claiming Bender lied to her about the risks of the surgery.  Rather, she says Bender lied to her as to

- 18 -

his experience, litigation history, licensure problems and having consulted with and obtained the approval of Dr. Fleck. These lies are physician-specific in nature and, in this case, were made in direct response to Willis' questions concerning the same. Consequently, we must decide whether Wyoming would extend its informed consent law to misrepresentations that are physician-specific in nature and made in direct response to a patient's questions.

In deciding issues of first impression, the Wyoming Supreme Court often looks outside its borders for guidance. *See, e.g., Starkey v. Starkey*, 161 P.3d 515, 517 (Wyo. 2007); *State ex. rel. Wyo. Workers' Safety & Comp. Div. v. Faulkner*, 152 P.3d 394, 398 (Wyo. 2007); *Johnson v. State*, 61 P.3d 1234, 1243 (Wyo. 2003). Thus, we do the same. We find a number of courts have concluded physician-specific information such as experience is relevant to the informed consent issue and physicians have a duty to voluntarily disclose such information prior to obtaining a patient's consent. *See, e.g., Moore v. Regents of the Univ. of Cal.*, 271 Cal. Rptr. 146, 151-52 (Cal. 1990) (failure to inform patient of physician's research and economic interests in procedure prior to conducting it); *Barriocanal v. Gibbs*, 697 A.2d 1169, 1170, 1173 (Del. 1997) (failure to disclose that physician had not recently performed aneurism surgery and there were other nearby hospitals that specialized in aneurism surgery); *Hidding v. Williams*, 578 So.2d 1192, 1198 (La. Ct. App. 1991) (failure to inform patient that physician suffered from alcohol abuse at the time of the proposed surgery); *Goldberg v. Boone*, 912 A.2d 698, 717 (Md. 2006) (failure to inform patient there were other more experienced surgeons in the region that could perform the proposed procedure); *Johnson ex rel. Adler v.*

*Kokemoor*, 545 N.W.2d 495, 504-08 (Wis. 1996) (failure to disclose to patient there are substantially different morbidity and mortality rates of the proposed procedure depending on the physician's experience).  We do not believe, however, that Wyoming would follow these courts for several reasons.

First, as stated previously, Wyoming applies the traditional or professional standard in determining the scope of a physician's informed consent disclosure, asking what a reasonable practitioner of like training would have disclosed in the same or similar circumstances.  *Roybal*, 778 P.2d at 112.  The above cases utilize a reasonable patient standard, looking to whether a reasonable person in the patient's position would consider the information material to his decision as to whether to agree to allow the physician to perform the surgery upon him.[7] *See Moore*, 271 Cal. Rptr. at 150; *Barriocanal*, 697 A.2d at 1172-73; *Hidding*, 578 So.2d at 1195; *Goldberg*, 912 A.2d at 716; *Howard v. Univ. of Med. & Dentistry of N.J.*, 800 A.2d 73, 83 (N.J. 2002); *Johnson*, 545 N.W.2d at 501-02.  The difference is significant.  Obviously, what a reasonable person in the patient's position would find relevant in deciding whether to proceed with a particular procedure

---

[7] Prior to 1972, virtually all jurisdictions recognizing the informed consent doctrine used the traditional or professional rule.  In 1972, two cases adopted the prudent patient standard in measuring the physician's duty to disclose.  *Canterbury v. Spence*, 464 F.2d 772, 786-87 (D.C. Cir. 1972) (applying District of Columbia law); *Cobbs v. Grant*, 502 P.2d 1, 10-11 (Cal. 1972).  Under that standard, a physician must disclose all information which a reasonable person in the patient's position would consider material to her decision as to whether to allow the physician to perform the contemplated treatment or procedure upon her.  Unlike the traditional or professional rule, expert testimony is not required under the prudent patient standard.  Since 1972, a number of jurisdictions have adopted the prudent patient standard but it remains the minority position.  4 DAVID W. LOUISELL & HAROLD WILLIAMS, MEDICAL MALPRACTICE § 22.05[3],[4][B] (2009).

by a specific doctor is not necessarily what a reasonable practitioner of like training and experience would have disclosed in the same circumstances. Second, we believe Wyoming would find such expansion of a physician's informed consent duties to be overly burdensome to physicians. As one court explained in rejecting an informed consent claim based on a surgeon's failure to disclose his inexperience with the proposed procedure: "In theory, the physician's own health, financial situation, even medical school grades, could be considered material facts a patient would want to consider in consenting to treatment by that physician." *See Whiteside v. Lukson*, 947 P.2d 1263, 1265 (Wash. Ct. App. 1997).

But we need not decide the issue. The issue here is not whether Bender had a duty under Wyoming's informed consent law to voluntarily disclose physician-specific information but rather whether he had a duty to truthfully answer Willis' physician-specific questions. Only a few courts have addressed this question and again there is a split of authority.

In *Johnson*, the plaintiff sued the defendant neurosurgeon for lack of informed consent after being rendered an incomplete quadriplegic as a result of undergoing surgery to clip an aneurysm at the rear of her brain. She alleged that when she had questioned the defendant surgeon concerning his experience, he said he had performed the surgery "several" times; when she asked what he meant by "several," he said "dozens" and "lots of times." 545 N.W.2d at 499 (quotations omitted). In fact, the defendant had relatively limited experience with aneurysm surgery comparable to that performed on the plaintiff. The jury found in favor of the plaintiff. On appeal, the defendant argued, *inter alia*, the

- 21 -

trial court had erred in admitting evidence of his limited experience because informed consent only requires disclosure of the risks associated with a particular treatment, not the risks associated with a particular physician. The Wisconsin Supreme Court rejected this argument:

> In this case, the plaintiff introduced ample evidence that had a reasonable person in her position been aware of the defendant's relative lack of experience in performing basilar bifurcation aneurysm surgery, that person would not have undergone surgery with him. According to the record the plaintiff had made inquiry of the defendant's experience with surgery like hers. In response to her direct question about his experience he said that he had operated on aneurysms comparable to her aneurysm "dozens" of times . . . . We conclude that the circuit court did not erroneously exercise its discretion in admitting evidence regarding the defendant's lack of experience . . . . A reasonable person in the plaintiff's position would have considered such information material in making an intelligent and informed decision about the surgery.

*Id.* at 505.

Similarly, in *Howard v. Univ. of Med. & Dentistry of N.J.*, Mr. and Mrs. Howard sued the defendant surgeon for medical malpractice after Mr. Howard was rendered a quadriplegic as result of undergoing surgery performed by the defendant. 800 A.2d 73 (N.J. 2002). According to the Howards, prior to the surgery, Mrs. Howard had asked the defendant whether he was board-certified; he responded in the affirmative. The defendant also told them he had substantial experience with the proposed surgery. According to Mrs. Howard, she was opposed to the surgery and it was only after the defendant's claim of skill and experience that she and Mr. Howard consented to the surgery. During the defendant's deposition, the Howards learned for the first time the defendant was not board-certified and he had significantly overrepresented his experience

with the surgery. They sought to amend their complaint to add a fraud claim.

On appeal, the New Jersey Supreme Court declined to extend its common-law to allow a fraud or deceit-based claim based on a physician misrepresenting his credentials or experience to a patient. *Id.* at 82. However, it concluded the Howards stated a lack of informed consent claim. While a doctor does not have a duty to detail his background and experience to obtain the patient's consent, a doctor's significant misrepresentations concerning his qualifications can affect the validity of the consent obtained. *Id.* at 83. It explained:

> [D]efendant's misrepresentations induced plaintiff to consent to a surgical procedure, and its risk of paralysis, that he would not have undergone had he known the truth about defendant's qualifications. Stripped to its essentials, plaintiff's claim is founded on lack of informed consent.

*Id.* at 84; *see also Paulos v. Johnson*, 597 N.W.2d 316, 320 (Minn. Ct. App. 1999) (stating physician's misrepresentation while obtaining patient's consent to surgery that he was board-certified in response to patient's question concerning the same presents "a pure informed consent issue").

However, in *Duffy v. Flagg*, the patient, who had delivered her first child via a cesarean section, discussed with her physician the possibility of having her second child born vaginally. 905 A.2d 15 (Conn. 2006). The physician informed her of the risks of the procedure, known as vaginal birth after cesarean section delivery, including uterine rupture resulting in the patient and baby's deaths. The patient asked the physician whether she had encountered any difficulty with the procedure; the physician said there had been "a bad outcome" because of a uterine rupture. *Id.* at 16 (quotations omitted).

- 23 -

The patient did not inquire further and the physician did not explain that the baby had died as a result of that uterine rupture. Thereafter, the patient decided to attempt a vaginal birth after cesarean section delivery; the baby died due to complications during the birth.

The Connecticut Supreme Court concluded the informed consent doctrine only required disclosure of the nature of the procedure, its risks, its anticipated benefits and the alternatives to the procedure. *Id.* at 20. It declined to extend the doctrine to the physician's failure to disclose to the patient his experience with a procedure because that experience had no bearing on the patient's risks or otherwise pertained to any of the four factors required to be disclosed. *Id.* at 21-22. By limiting the informed consent doctrine to the four areas specified, the court sought to provide a rule of general applicability so physicians would have a clear understanding of the scope of the disclosures they must make and patients are not burdened with immaterial information that they may find confusing. *Id.* at 23. It rejected the patient's claim that if evidence regarding a physician's experience and/or his candor in revealing that experience is not relevant to an informed consent claim then a physician will have no duty to truthfully answer questions concerning his skills, qualifications or experience. *Id.* The court said nothing in its ruling prevented the physician from being held liable for misrepresentation. *Id.*

Similarly, in *Duttry v. Patterson*, the patient asked the physician about his experience in performing the type of operation he recommended. 771 A.2d 1255 (Pa. 2001). The physician stated he had performed this procedure sixty times in the preceding five years but, in fact, had only performed it nine times during that period. The court

- 24 -

determined the informed consent doctrine required a physician to provide a patient with material information necessary for her to determine whether to proceed with the proposed procedure. *Id.* at 1258. In previous cases, this material information had been defined as the nature of the proposed procedure, its seriousness, the organs of the body involved, the disease sought to be cured and the possible results, in other words, those "material facts, risks, complications and alternatives to surgery that a reasonable person in the patient's situation would consider significant in deciding whether to have [a procedure]." *Id.* (quotations omitted). The court declined to extend the informed consent doctrine to require disclosure of a physician's personal characteristics and experience, whether or not this information was solicited by the patient. *Id.* at 1259. However, it did not foreclose other avenues for relief such as a misrepresentation claim. *Id.*

While the cases are conflicting, we believe the Wyoming Supreme Court would follow *Johnson*, *Howard* and *Paulos* as they are the better reasoned. Bender's alleged misrepresentations to Willis in response to her direct questions allegedly induced her to consent to the surgery and its risks. Under these circumstances, if proved, her consent can hardly be considered "informed." We recognize *Duffy* and *Duttry* did not entirely foreclose an action against a physician who lies to a patient in response to questions asked in the course of obtaining consent, stating the patient may have a misrepresentation claim. The district court intimated the same and Bender agrees.[8] However, when the

---

[8] Bender also said at oral argument that patients could file a complaint with the Wyoming Board of Medicine. But according to the Board's website, if a patient's complaint:

- 25 -

misrepresentation occurs during the physician-patient relationship and in the course of a physician obtaining the patient's consent to a proposed treatment or procedure, we see no reason why Wyoming would limit the patient's claim to the more generic negligent misrepresentation tort, especially since it is doubtful whether a negligent misrepresentation claim is an avenue of relief available to most patients in Wyoming.

Wyoming has adopted § 552 of the Restatement (Second) of Torts for the elements of negligent misrepresentation. *Verschoor v. Mountain W. Farm Bureau Mut. Ins. Co.*, 907 P.2d 1293, 1299 (Wyo. 1995). Section 552 states in relevant part:

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

RESTATEMENT (SECOND) OF TORTS § 552(1) (1965); *see also Verschoor,* 907 P.2d at 1299 ("The elements of a negligent misrepresentation claim are . . . [f]alse information supplied in the course of one's business for the guidance of others in their business, failure to exercise reasonable care in obtaining or relating the information, and pecuniary loss resulting from justifiable reliance thereon.") (quotations omitted). This rule applies

---

> proves true, the Board may take appropriate action including revocation of the physician's license to practice medicine, suspension or probation under monitoring, restriction of the scope of the practice, requiring additional training and/or testing, mental and/or physical competency examinations, the imposition of fines and any number of combinations of these sanctions appropriate under the circumstances of the case.

*See* http://wyomedboard.state.wy.us/complaintprocess.asp. Therefore, the Board provides no relief to patients but instead concentrates on disciplining the physician.

when an individual suffers pecuniary loss as a result of his reasonable reliance on the misrepresentation of another. A patient harmed by a physician's misrepresentations may not always suffer economic loss.[9] In any event, as the Wisconsin Supreme Court said in *Johnson*, the fact overlap exists between negligent misrepresentation and informed consent "does not preclude the plaintiff from making allegations and introducing evidence in an informed consent case which might also have been pled in a negligent misrepresentation case." 545 N.W. 2d at 504 n.29.

We also find unpersuasive the reasons the Connecticut Supreme Court gave in *Duffy* for rejecting the expansion of its informed consent doctrine to include physician-specific misrepresentations in response to a patient's direct questions. We need not worry about confusing physicians as to the scope of their disclosures; requiring physicians to honestly answer a patient's questions is a bright-line rule not subject to

---

[9] The Restatement (Second) of Torts recognizes a claim for negligent misrepresentation resulting in physical harm. Section 311 provides: "One who negligently gives false information to another is subject to liability for physical harm caused by action taken by the other in reasonable reliance upon such information, where such harm results to the other . . . ." RESTATEMENT (SECOND) OF TORTS § 311(1) (1965). Comment (b) states:

> The rule stated in this Section finds particular application where it is a part of the actor's business or profession to give information upon which the safety of the recipient or a third person depends. Thus it is as much a part of the professional duty of a physician to give correct information as to the character of the disease from which his patient is suffering, where such knowledge is necessary to the safety of the patient or others, as it is to make a correct diagnosis or to prescribe the appropriate medicine . . . .

*Id.* cmt. b. Wyoming has not adopted this definition for the generic tort of negligent misrepresentation.

conflicting interpretations. Nor would such requirement burden patients with immaterial information as they would only receive that information they found material enough to request from the physician. Moreover, the physician, if he thought the requested information was not pertinent, could simply say so and refuse to answer.

Wyoming's application of the traditional or professional standard to determine the scope of a physician's required disclosure does not require a different conclusion. That standard has only been applied to determine what information a physician is required to voluntarily disclose to a patient prior to obtaining his consent. It would appear to have no applicability to determining whether a doctor may lie to a patient in direct response to the patient's questions in the course of obtaining the patient's consent. In any event, one would be hard pressed to argue a reasonable physician of like training would lie to a patient in obtaining consent.

We recognize difficult trial issues are likely to result from our conclusion. Patients will frequently allege (as Willis did here) both a negligent treatment claim and a lack of informed consent claim in a single lawsuit. In such cases, there is a real concern the jury will use evidence relevant to the informed consent claim, such as a physician's lack of experience and litigation history, to improperly infer negligent treatment. We also envision cases where a patient will seek to prove the falsity of a physician's statements with the use of "prior bad act" evidence normally excluded under Rule 404(b) of the Federal Rules of Evidence. For example, a patient may allege his doctor lied to him about his competency to perform a certain procedure and seek to prove it by showing the doctor was incompetent in other cases. Such concerns need not deter us long. Trial

courts frequently confront these types of issues, especially in the criminal law context.

They can be easily remedied or minimized at the summary judgment stage, with

appropriate jury instructions, or by bifurcating the trial. They should not prevent us from

recognizing a cause of action where one exists. And these problems would arise even if,

as Bender argues, the patient's claim should be limited to negligent misrepresentation.

We emphasize we are not saying Wyoming would impose upon physicians an

affirmative duty to <u>voluntarily</u> disclose <u>physician-specific</u> information or to obtain the

approval of a patient's regular physician prior to obtaining consent. Our decision is quite

narrow. We only predict the Wyoming Supreme Court would allow an informed consent

claim where a physician <u>lies</u> to a patient as to <u>physician-specific</u> information <u>in direct</u>

<u>response to a patient's questions concerning the same</u> in the course of obtaining the

patient's consent and the questions seek <u>concrete verifiable facts</u>, not the doctor's

subjective opinion or judgment as to the quality of his performance or abilities.[10]

Having concluded Wyoming would extend the informed consent doctrine to the

circumstances of the case *sub judice*, Willis must also establish causation. In Wyoming,

with respect to the proximate cause element, the plaintiff must offer "proof that proper

---

[10] For instance, Willis' questions in this case concerning Bender's experience and track record with the laparoscopic procedure, whether he had ever been sued or had any problems with his medical license, and whether he consulted with and obtained the approval of Dr. Fleck, are verifiable and fact-based. They do not call for Bender's subjective opinion or judgment. Questions such as "how good of a surgeon are you?" are not readily verifiable and call for the doctor's subjective opinion. Such questions are not within the scope of our narrow holding. Whether questions posed to a doctor are actionable are legal questions or at least, mixed questions of law and fact, for the judge to decide, perhaps after a hearing, before sending the issue to the jury.

disclosure would have resulted in a decision against the proposed treatment or procedure."[11] *Roybal*, 778 P.2d at 112. Wyoming has adopted the objective test for measuring the causal connection in informed consent cases. *Id.* at 112-13. Unlike the subjective test, which "considers what the plaintiff would have done if the risks had been properly disclosed," the objective test "focuses on what a reasonable person in the plaintiff's position would have done if the risks had been adequately disclosed."[12] *Id.* at 112. Under the objective test, "the patient's hindsight testimony is relevant but not controlling." *Id.*

In this case, there is evidence supporting Willis' claim that had Bender not lied to her, she would not have consented to the surgery. This evidence includes, among other things: (1) Willis' testimony that had Bender not lied to her, she would not have hired him or undergone the proposed procedure; (2) Willis had been advised by Dr. Fleck that any future abdominal surgeries should be performed using the open procedure due to her adhesions; and (3) Bender's litigation history included a lawsuit by the family of a patient who had died after undergoing a laparoscopic cholecystectomy performed by Bender in

---

[11] Bender relies on *Howard* for the proposition that Willis was required to show his alleged misrepresentations increased her risk of injury from the laparoscopic procedure or created an additional risk of injury in order to establish causation. The district court said the same. But this is not Wyoming law. Our conclusion, based in part on the reasoning of *Howard*, that Wyoming would recognize an informed consent claim under the circumstances presented in this case does not require us to also expand the causation element of Wyoming's informed consent doctrine to that required in *Howard*.

[12] The subjective test has been criticized because it turns on the credibility of the hindsight of the patient who is seeking redress after an undesirable result. It also precludes recovery to a patient who dies as a result of the physician's treatment. *Roybal*, 778 P.2d at 112.

2001. However, there is also evidence negating causation, including, *inter alia*, (1) Bender informing Willis he would convert to an open procedure if he could not proceed laparoscopically; (2) Bender telling Willis her condition was serious enough that she should not wait until after tax season to have it done (she worked in an accountant's office) because then it could turn into an emergency surgery; (3) the previous lawsuits against Bender (except one) had been dismissed prior to trial; and (4) had Bender called Fleck he would have just warned Bender of Willis' adhesions, which she herself warned him of and which were obvious to him based on her previous surgical history. Given the conflicting evidence, the causation question is best left for the jury.

We reverse the district court's grant of summary judgment to Bender on the informed consent claim.

B.      Medical Malpractice—Captain of the Ship Instruction

Willis complains the court erred in rejecting her proposed "captain of the ship" instruction which would have allowed the jury to hold Bender liable for Dr. Kirk's negligence. She claims Wyoming recognizes the "captain of the ship" doctrine; in fact, her proposed instruction is Instruction 14.09 of the Wyoming Civil Pattern Jury Instructions. Willis also asserts that during trial she proved the cause of her perforated bowel was the blind manipulation of the laparoscopic camera by Dr. Kirk who was working under Bender's direction. Therefore, by refusing the instruction, the court allowed the jury to find her injury was caused by the negligence of Dr. Kirk, for whom Bender was legally responsible, yet allow Bender to escape liability.

Bender claims Wyoming has not adopted the "captain of the ship" doctrine and

because the underlying basis for the doctrine has ceased to exist, it would likely not adopt

it, as have a majority of the jurisdictions to recently address the issue. Even assuming the

"captain of the ship" doctrine was viable in Wyoming, there was no evidence,

specifically expert testimony, that Dr. Kirk was negligent and therefore no basis to hold

Bender liable for Dr. Kirk's negligence.

### 1. Standard of Review

In a diversity case, the substance of a jury instruction is a matter of state
law, but the grant or denial of a tendered instruction is governed by federal
law. Although we review the district court's refusal to give a particular
instruction for abuse of discretion, the ultimate question of whether the jury
was properly instructed is a question of law which we review *de novo*.
Furthermore, we must examine the instructions as a whole to determine if
they sufficiently cover the issues in the case and focus on the facts
presented by the evidence.

*Blanke*, 152 F.3d at 1232 (quotations and citations omitted).

### 2. Analysis

Until the 1940's, hospitals enjoyed "charitable immunity," entitling them to total

immunity against their patients' medical malpractice suits. *See* KENNETH S. ABRAHAM &

PAUL C. WEILDER, *Enterprise Medical Liability and the Evolution of the American*

*Health Care System*, 108 Harv. L. Rev. 381, 385 (1994). As a result, patients injured by

a hospital employee's negligence were often left without a form of redress for their

injuries. *Lewis v. Physicians Ins. Co. of Wis.*, 627 N.W.2d 484, 492 (Wis. 2001). In an

attempt to fill this gap, courts began using the "borrowed servant" doctrine to impose

liability on the surgeon for negligence occurring in the operating room. *Franklin v.*

*Gupta*, 567 A.2d 524, 535 (Md. Ct. Spec. App. 1990). "The notion was that the surgeon

- 32 -

acted as a special employer who borrowed nurses and other attendants from their general employer—the hospital—and thus became liable for their negligence." *Id.* Liability, however, was conditioned on showing "the surgeon actually controlled or had a right to control the details of the servant's conduct." *Id.*

In *McConnell v. Williams*, the Pennsylvania Supreme Court applied the "borrowed servant" doctrine in a medical malpractice case in which the plaintiff sought to hold her obstetrician liable for a hospital intern's negligent administration of silver nitrate into the eyes of the plaintiff's newborn immediately after a caesarian section performed by the obstetrician. 65 A.2d 243 (Pa. 1949). The court concluded there was a jury question as to whether there was a master-servant relationship between the obstetrician and the intern at the time of the intern's negligence; if so, the obstetrician was liable for that negligence. *Id.* at 248. Whether such relationship existed depended on whether the obstetrician had supervisory control over and the right to give orders to the intern at the time of the negligence. *Id.* at 246. In applying these principles, the court analogized a surgeon to a captain of a ship:

> [I]t can readily be understood that in the course of an operation in the operating room of a hospital, and until the surgeon leaves that room at the conclusion of the operation, . . . he is in the same complete charge of those who are present and assisting him as is the captain of a ship over all on board, and that such supreme control is indeed essential in view of the high degree of protection to which an anaesthetized, unconscious patient is entitled . . . .

*Id.*

While it is clear from the *McConnell* decision that the court was not applying any

- 33 -

new agency theory[13] and its reference to a captain of the ship was a mere analogy, some jurisdictions began using the phrase "captain of the ship" to impose strict or absolute liability on a surgeon for the negligence of every person associated with a patient's surgery regardless of whether the surgeon actually exercised any control over the actor. In other words, the surgeon's liability was presumed based on his mere status as surgeon and his presence in the operating room rather than any showing of actual control over the negligent actor. *See Sparger v. Worley Hosp., Inc.*, 547 S.W.2d 582, 584-85 (Tex. 1977); *Thomas v. Raleigh Gen. Hosp.*, 358 S.E.2d 222, 224 (W. Va. 1987).

As hospitals have lost their charitable immunity and become large-scale providers of medical services with significant control over the manner in which their employees, including staff physicians, provide treatment, more recent courts have rejected the "captain of the ship" doctrine in favor of general agency principles. *See, e.g., Franklin*, 567 A.2d at 539 (rejecting "captain of the ship" doctrine in favor of "borrowed servant" doctrine; "[g]iven the statutory curtailment of a hospital's eleemosynary and governmental immunity in Maryland . . . there is no socio-economic need to extend the vicarious liability of a surgeon for the negligence of hospital employees simply to create a fund for victims of malpractice"); *Harris v. Miller*, 438 S.E.2d 731, 738, 740 (N.C.

---

[13] *See McConnell*, 65 A.2d at 248 ("It is for the jury to determine whether the relationship between defendant and the intern[], at the time the child's eyes were injured, was that of master and servant. If such was the relationship, defendant is legally liable for the injury caused by the intern[]'s alleged negligence."). Moreover, the Pennsylvania Supreme Court later said: "[T]he 'captain of the ship' concept is but the adaptation of the familiar 'borrowed servant' principle in the law of agency to the operating room of a hospital." *Thomas v. Hutchinson*, 275 A.2d 23, 27 (Pa. 1971).

1994) (holding "surgeons should no longer be presumed to enjoy the authoritative control of a master over all who assist merely because they are 'in charge' of the operation" and instead looking to respondeat superior and borrowed servant principles); *Anglin v. Kleeman*, 665 A.2d 747, 751 (N.H. 1995) (rejecting "captain of the ship" theory of liability; "[i]n modern medicine, the surgeon is a member of a team of professionals, and we see no reason why the surgeon should be deemed responsible for the actions of other professionals neither employed nor controlled by him"); *Sparger*, 547 S.W.2d at 585 ("We disapprove the captain of the ship doctrine and hold that it is a false special rule of agency. Operating surgeons and hospitals are subject to the principles of agency law [(master-servant and borrowed servant doctrines)] which apply to others."); *Lewis*, 627 N.W.2d at 493-94 ("'[C]aptain of the ship' has lost its vitality across the country as plaintiffs have been able to sustain actions []against full-care modern hospitals for the negligence of their employees[;] [a]ccordingly, we decline to resurrect the anachronistic 'captain of the ship' doctrine . . . .").

There are few courts which still employ the "captain of the ship" doctrine. *See, e.g., Fields v. Yusuf*, 51 Cal. Rptr. 3d 277, 288 (Cal. Ct. App. 2006); *Ochoa v. Vered*, 186 P.3d 107, 112 (Colo. Ct. App. 2008); *Szabo v. Bryn Mawr Hosp.*, 638 A.2d 1004, 1006 (Pa. Super. Ct. 1994). However, even these courts do not apply it in its purest form (*i.e.*, strict liability) but instead look to agency principles, in particular, requiring the surgeon to have controlled and supervised the negligent actor's work as well as the manner in which it was done at the time of the alleged negligence. *See Fields*, 51 Cal. Rptr. 3d at 287 ("The 'captain of the ship' doctrine imposes liability on a surgeon under the doctrine

- 35 -

of respondeat superior for the acts of those under the surgeon's special supervision and control during the operation."); *Ochoa*, 186 P.3d at 110-11 (same); *Szabo*, 638 A.2d at 1006 ("The 'Captain of the Ship' Doctrine has agency considerations at its base. The essential question . . . is whether one is subject to the control of another not only to the work to be done but also the manner of performing it.") (citation and quotations omitted). Even the instruction proposed by Willis does not impose liability on the surgeon for an assistant's negligence unless the negligence occurs while the assistant is under the surgeon's direction.

We have uncovered no Wyoming case specifically addressing the "captain of the ship" doctrine.[14] While normally we would attempt to determine what the Wyoming Supreme Court would do if confronted with the issue, we need not do so here. Willis was not entitled to her proposed instruction because, as the district court decided, the evidence did not support its tender. *See Woolard v. JLG Indus., Inc.*, 210 F.3d 1158, 1177 (10th

---

[14] Relying on *Jackson v. Hansard*, Willis claims Wyoming recognizes the "captain of the ship" doctrine. 17 P.2d 659 (Wyo. 1933). We disagree. In *Jackson*, the Wyoming Supreme Court did not hold the surgeon liable for his assistant's negligence but rather for his own negligence. *Id.* at 663. Moreover, the fact Willis' proposed instruction appears in Wyoming's Civil Pattern Jury Instructions does not mean the Wyoming Supreme Court has adopted it. Indeed, in the comment preceding the instruction, it says:

> No Wyoming Supreme Court case has directly addressed the responsibility of the surgeon for errors or omissions of the members of the surgical team. *But see Jackson v. Hansard*, 17 P.2d 659, 662 (Wyo. 1933). Nevertheless, the following instruction has been a part of the Wyoming Civil Pattern Jury Instructions for some time and appears to state the general rule elsewhere in the country.

And the citations provided in support of the instruction include two California sources.

Cir. 2000) (stating a party "is entitled to an instruction based on its theory of the case if it has produced appropriate evidence to support it"); *see also Short v. Spring Creek Ranch, Inc.*, 731 P.2d 1195, 1199 (Wyo. 1987) ("[A] party is entitled to have a jury instruction upon its theory of the case but only if such theory is supported by competent evidence and a proper request for the instruction is made.").

The proposed instruction sought to hold Bender liable for the negligence of the surgical assistant acting under his direction (Dr. Kirk). The only alleged negligence supported by Willis with expert testimony was Bender's decision to continue with the laparoscopic approach after the first two attempts to enter Willis' abdomen were unsuccessful. While Willis' expert also testified he believed the perforated bowel was caused by manipulation of one of the laparoscopic instruments held outside the field of view (presumably held by Dr. Kirk), he did not testify such manipulation fell below the standard of care. Expert testimony was necessary. *See Siebert v. Fowler*, 637 P.2d 255, 257 (Wyo. 1981) (stating expert testimony is necessary to prove the standard of care, whether the physician's conduct fell below the standard of care, and whether that conduct was the legal cause of the plaintiff's injuries). Absent expert testimony establishing Dr. Kirk was negligent, there was no basis for the proposed instruction.

Even Bender's evidence did not support the giving of the instruction. Bender himself conceded the bowel perforation occurred sometime during the laparoscopic cholecystectomy and he took full responsibility for it. While he did not admit his conduct was negligent, neither did he claim it was caused by Dr. Kirk's negligence. Bender's expert, Dr. Barry Gardiner, also did not blame Dr. Kirk for Willis' injury. He believed

Willis' injury occurred as Bender was "taking down" a dense adhesion connecting the bowel to the abdominal wall. (R. Appellee's Supp. App. at 330.) Again, absent evidence suggesting anyone involved in the surgery other than Bender was negligent, the court properly rejected Willis' proposed instruction. *See Spoor v. Serota*, 852 P.2d 1292, 1296 (Colo. Ct. App. 1992) ("captain of the ship" instruction not warranted absent evidence to support negligence claim against any party involved in the surgery other than the surgeon).

## IV.   CONCLUSION

We **REVERSE** the district court's grant of summary judgment to Bender on the informed consent claim but **AFFIRM** its denial of Willis' request for a "captain of the ship" jury instruction. The case is **REMANDED** for further proceedings consistent with this opinion.